Peter J. **VRDOLYAK**, Plaintiff,

v.

**CITY OF CHICAGO, an Illinois Municipal Corporation; Harold Washington, Mayor of the City of Chicago; Charles A. Pounian, Commissioner of the Department of Personnel of the City of Chicago; and Harry L. Manley, Acting Commissioner of the Department of Inspectional Services of the City of Chicago, Defendants.**

No. 83 C 7999.

United States District Court, N.D. Illinois, E.D.

Nov. 27, 1984.

---

6. Plaintiffs' motion to vacate the stay of pre-trial discovery is rendered moot.

William J. Harte, William J. Harte, Ltd., Chicago, Ill., for plaintiff.

Robert Graham, Jenner & Block, Donald Hubert, James D. Montgomery, Acting Corporation Counsel, Chicago, Ill., for defendants.

## MEMORANDUM ORDER

BUA, District Judge.

The above-captioned matter came before the Court for trial on the merits of plaintiff Peter J. Vrdolyak's Verified Complaint for violation of the provisions of this Court's consent decree entered on May 5, 1972, the terms of which, *inter alia*, permanently enjoin the City of Chicago and its Mayor from:

> conditioning, basing, or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee upon or because of any political reason or factor.

*Shakman v. Democratic Organization of Cook County*, No. 69 C 2145, *reprinted at*, 481 F.Supp. 1315, 1356 app. (N.D.Ill.1979) ("1972 Consent Decree"). The Court, having heard testimony on November 14, 1983, June 12, 1984, and June 14, 1984, and having reviewed exhibits and memoranda filed by the parties, does hereby enter the fol-

lowing findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. *The Parties*

1. Peter J. Vrdolyak ("Vrdolyak") is a resident, registered voter and taxpayer in Chicago, Illinois. Vrdolyak has been employed by the City of Chicago for over eight years and has served as Assistant Director of Technical Inspections in the Department of Inspectional Services from January 1, 1981, to November 9, 1983. After this Court entered and continued a temporary restraining order and preliminary injunction on November 14, 1983, to enjoin defendants from terminating Vrdolyak, Vrdolyak has remained employed in his job title with the City of Chicago until the present time.

2. Defendant City of Chicago ("the City") is an Illinois municipal corporation.

3. Defendant Harold Washington ("Washington") is the Mayor of the City of Chicago.

4. Defendant Charles A. Pounian ("Pounian") is the Commissioner of the Department of Personnel for the City of Chicago.

5. Defendant Harry L. Manley ("Manley") is the Acting Commissioner of the Department of Inspectional Services for the City of Chicago.

### B. *Applicable Provisions of the Shakman Consent Decree*

6. On May 5, 1972, a Consent Decree was entered in the case entitled *Shakman v. Democratic Organization of Cook County,* No. 69 C 2145 (N.D.Ill.1972). Pursuant to Paragraph E(1) of 1972 Consent Decree:

> E. Each and all of the defendants and others are permanently enjoined from directly or indirectly in whole or in part:
> (1) Conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment with respect to one who is at the time already a government employee upon or because of any political reason or factor.

7. On June 20, 1983, a Consent Decree entitled "Judgment as to the City of Chicago and its Mayor" was entered in *Shakman* under which there were listed at Schedule G certain positions with the City of Chicago which were to be exempt from the requirements of Paragraph E(1) of the 1972 Consent Decree. Vrdolyak's position is listed as exempt on Schedule G.

8. Also on June 20, 1983, a Consent Decree entitled, "Order Retaining Jurisdiction as to City Exemptions," was entered under which this Court retained jurisdiction to allow City employees holding exempt positions under Schedule G to file petitions to contest the scheduling of their positions as exempt:

> By this Order, the Court retains jurisdiction to consider petitions requesting for good cause that particular positions listed in Part G should be deleted from the Schedule and to give such other relief as may be appropriate. Such petitions may be filed only by persons currently holding a position on the Exempt List who shall have been discharged or demoted from, or are notified seven days in advance of the city's intention to discharge or demote them from the jobs.

9. The injunctive provisions of the *Shakman* Consent Decrees are applicable to and binding upon defendants Washington, Pounian and Manley who, in their respective positions as Mayor, Commissioner of the Department of Personnel and Acting Commissioner of the Department of Inspectional Services of the City of Chicago, hold responsibility for formulating and implementing employment policies and practices for the City of Chicago.

### C. *Organization of the Department of Inspectional Services*

10. The Department of Inspectional Services is charged with administering the Building Code of the City of Chicago. Prior to 1980, it was known as the Department of Buildings. The Department is divided into four bureaus; one of these, the Bureau of Technical Inspections, is responsible for administering the Building Code with respect to new construction. The Bu-

reau of Technical Inspections is divided into seven sections corresponding to various construction trades as follows:

(1) Boiler Inspection Section;

(2) Construction Inspection Section;

(3) Electrical Inspection Section;

(4) Elevator Inspection Section;

(5) Iron Inspection Section;

(6) Mechanical Equipment Inspection Section; and

(7) Plumbing Inspection Section.

11. The chain of command relevant to Vrdolyak's position begins with the Mayor of the City of Chicago. Below the Mayor is the Commissioner of the Department of Inspectional Services, a cabinet level position.[1] Below the Commissioner are two Deputy Commissioners.[2] Also reporting to the Commissioner and subordinate to the Deputy Commissioners is an Assistant Commissioner.[3]

12. Reporting directly to the Deputy Commissioners are the Directors of the four Bureaus. Since January, 1980, James Brick has been employed as director of the Bureau of Technical Inspections. Vrdolyak, as Assistant Director, reports to James Brick. Below Vrdolyak are the chiefs of the seven inspection sections. In addition to the chiefs, there are assistant chiefs and superintendents, depending on the section. Finally, at the end of the chain of command are the field workers of the seven sections who are the inspectors.

13. The duties of the position held by Vrdolyak, Assistant Director of Technical Inspection, include: assisting the Director of the Bureau of Technical Inspections in the coordination of the Bureau's operations and procedures; assisting the Director in formulating and enforcing work quality and performance standards for the seven technical sections; addressing complaints and answering correspondence; assisting the Director in matters regarding Building Code amendments, revisions and deletions; coordinating special inspection programs; assisting the Director by meeting with City attorneys and Bureau personnel regarding Bureau litigation; assuming the duties and responsibilities of the Director in his absence; and, in the Director's absence and upon his request, meeting with various outside groups as the representative of the Bureau of Technical Inspections. *See* Plaintiff's Exhibit 3.

14. In addition, Vrdolyak spends a substantial amount of his time as the head of the Iron Section. Director Brick estimates that Vrdolyak spends 85 to 90 percent of his time on Iron Section work; Vrdolyak estimates the proportion to be about 50 to 60 percent.

### D. *Plaintiff's Employment History*

15. After graduating from high school, Vrdolyak served in the United States Navy and Army Air Force before completing one year of study at DePaul University in a pre-law program. Vrdolyak then spent the next several years in the construction trades as foreman, general foreman, job superintendent and project manager. Vrdolyak's duties as project manager included overall responsibility for all trades on the job, such as electricians, bricklayers, boilermakers, carpenters, laborers, pipefitters, and ironworkers. Vrdolyak's duties, as project manager, also included reviewing and inspecting all work in progress to ensure that it conformed to the architect's plans and specifications and the Building Code of the City of Chicago. During the 1960s, Vrdolyak was employed by the State of Illinois as a construction safety inspector. He left that employment in 1969 and returned to private industry.

16. Vrdolyak applied for employment with the City's Department of Buildings on May 2, 1975. He was employed by that Department from June 4, 1975 to February

---

**1.** From January, 1980 to September, 1983, the Commissioner was William Duggan. Since September, 1983, defendant Harry Manley has been Acting Commissioner.

**2.** The Deputy Commissioners are presently Thaddeus Kason and Samuel Nolan. Before September, 1983, Nick Fera was Deputy Commissioner in Kason's place.

**3.** William Browning has been Assistant Commissioner since 1980.

1, 1977, as a Structural Iron Inspector. From February 1, 1977 to January 1, 1980, Vrdolyak was employed by the Department as Assistant Chief Iron Inspector. When the Department of Buildings was reorganized into the Department of Inspectional Services, Vrdolyak became the Supervising Iron Inspector and held that position from January 1, 1980 to January 1, 1981. On January 1, 1981, Vrdolyak was appointed Assistant Director of the Bureau of Technical Inspections in the Department of Inspectional Services at an annual salary of $32,772. On January 1, 1982, his salary was raised to $45,240. On January 1, 1983, Mr. Vrdolyak's salary was raised to $47,508.

17. Prior to his termination on November 4, 1983, Vrdolyak had not received any complaints regarding the performance of his duties. Neither former Commissioner Duggan, nor Director Brick, had ever received information indicating that Vrdolyak was not performing his responsibilities properly.

### E. *Events Preceding Plaintiff's Termination*

18. Plaintiff Peter J. Vrdolyak is the older brother of Edward R. Vrdolyak, Alderman of the 10th Ward of the City of Chicago. Alderman Vrdolyak has been widely portrayed by the Chicago media as one of the principal political opponents of Mayor Washington. During the Mayoral primary campaign of February, 1983, Peter Vrdolyak visibly and actively supported the candidacy of then Mayor Jane M. Byrne. In addition, Peter Vrdolyak has been politically active in the 10th Ward Regular Democratic Organization.

19. On April 12, 1983, defendant Harold Washington was elected Mayor of the City of Chicago.

20. On Friday, August 26, 1983, *The Daily Calumet* published an article entitled "City Lays Off 2,000 Workers: Vrdolyak's Brother Peter Heads the List," written by John Kass and Mark Eissanan. According to the article, a source described as a "[Mayor] Washington spokesman" stated that Vrdolyak had lost his job even though formal notice of termination was not received by Vrdolyak until more than two months later. Brick, Vrdolyak's immediate supervisor, and then Commissioner Duggan both testified that prior to publication of the article neither had received any request from the Mayor's office regarding Vrdolyak's work as Assistant Director nor had they received any information regarding the termination of Vrdolyak.

21. In September, 1983, both Commissioner Duggan and Deputy Commissioner Nick Fera were terminated from their positions in the Department of Inspectional Services by the Washington administration. At that time, defendant Manley became Acting Commissioner of the Department.

22. On September 21, 1983, Vrdolyak was interviewed by Rose Macon, a consultant retained by the Washington administration. At the beginning of the interview Vrdolyak was asked if he was related to 10th Ward Alderman Edward R. Vrdolyak. Vrdolyak confirmed that he is the older brother of the Alderman. Macon admitted that, at the time of the interview, she knew Vrdolyak's brother was reported to be the Mayor's principal political opponent.

23. Prior to Vrdolyak's termination, Acting Commissioner Manley believed that he could terminate Vrdolyak because Vrdolyak held an exempt position. In addition, Assistant Commissioner Browning believed that Vrdolyak could be fired for political reasons since his position is exempt and "belongs to the Mayor." Transcript at 431.

24. On September 23, 1983, Acting Commissioner Manley issued a memorandum directed to the Department's Section Chiefs and Program Persons which stated, in part:

It shall be the policy of this administration that ability and demonstrated performance will be the sole basis of retention and promotion.

Defendants' Exhibit 31.

25. On Friday, November 4, 1983, Vrdolyak received from Manley a letter dated November 2, 1983, notifying Vrdolyak that he was terminated effective November 9, 1983, from his position as Assist-

ant Director of Technical Inspections in the Department of Inspectional Services. The letter gives no reason for the termination. The letter indicates that copies were sent to Charles Hunter and Ira Bach of the Mayor's office; William Ware, the Mayor's Chief Administrative Assistant; James Montgomery, Corporation Counsel; and Charles Pounian, City Commissioner of Personnel.

26. Vrdolyak was not offered a demotion or lateral transfer or given an opportunity to secure any other type of employment with the City. Acting Commissioner Manley testified that he never considered any of these alternatives to termination.

27. On November 7, 1983, Channel 5 television news reporter Art Noonan reported that Acting Commissioner Manley stated the following in regard to Vrdolyak's termination:

> If, indeed, we are going to provide a better service, I think that that office, that individual, that that position can better be served by someone else that is in concert with what my provisions are, with what my aims and applications are for the Department. It has nothing to do with any political implications, identifications, or anything else.

At trial, Manley did not recall giving the statement but admitted that, "[i]t sounds like my language." Transcript at 258. Manley testified that Vrdolyak was not terminated for budgetary reasons.

28. A total of ten employees, including Vrdolyak, were terminated by Acting Commissioner Manley on November 2, 1983. The nine other employees terminated were: Herman Moses, Director of Licensing, Registration and Permits; Conrad Nicosia, Data Services Administrator; Kenneth Gula, Construction Inspection Supervisor; Stanley Scherr, Supervisor of Administrative Services; Pascal J. Sabino, District Director; Franklin Truesdale, Construction Inspection Supervisor; Leonard A. Waitches, Records Administrator; Nick O. Spino, District Director; and Anton Hipsky, Staff Assistant. Five of the employees terminated on November 2, 1983, are currently employed by the City. Sabino, Spino, Waitch-

es, Truesdale and Gula are presently employed by the Department of Inspectional Services.

29. To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, they are hereby adopted as conclusions of law.

## II. CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the Court makes the following conclusions of law:

1. This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331 and the "Order Retaining Jurisdiction as to City Exemptions" entered June 20, 1983, in *Shakman v. Democratic Organization of Cook County*, No. 69 C 2145 (N.D.Ill.1983).

2. Venue properly lies with this Court pursuant to 28 U.S.C. § 1391.

3. The Court has previously dismissed defendants Harold Washington and Charles Pounian from the case pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. See Transcript of Proceedings at 404.

4. Plaintiff Peter J. Vrdolyak, a City employee and registered voter, has standing to bring this suit under the *Shakman* Decree. *See Petition of Richard L. Voytas,* 560 F.Supp. 863, 865 (N.D.Ill.1983).

### A. *The Exempt Issue*

5. In determining whether a position is properly listed as exempt under Schedule G of the June 20, 1983 Decree, the Court relies upon the "policymaker exception" to the first amendment's protection of public employees. *See Shakman v. Democratic Organization of Cook County,* 722 F.2d 1307 (7th Cir.1983) (*Petition of Lindsey*). A position is properly listed as exempt if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980).

Positions which may require party affiliation often are positions which authorize,

either directly or indirectly, "meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Shakman v. Democratic Organization of Cook County,* 722 F.2d 1307, 1309 (7th Cir.1983) (*Petition of Lindsey*). Factors which are relevant to this inquiry include: (1) whether the position involves policymaking and requires confidentiality; (2) whether the responsibilities of the position are broadly defined; (3) whether the subject matter of the duties are highly sensitive; (4) whether the nature of the position requires a close working relationship with policymakers; and (5) whether considerations of personal loyalty are appropriate. *See generally Petition of Lindsey, supra,* 722 F.2d 1307; *Petition of Lindsey,* 552 F.Supp. 907 (N.D.Ill.1982).

7. The ultimate purpose of the policymaker exception is "to ensure that the first amendment's protection not interfere with the workings of democratic governments and the ability of duly elected officials to implement their policies." *Petition of Lindsey, supra,* 722 F.2d at 1310. It is important, however, "not to confuse the interest of partisan organizations with governmental interests." *Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976). Only the latter will justify use of the policymaker exception. *Id.*

8. Applying the above standards in this case, the Court is convinced that Vrdolyak's position as Assistant Director of Technical Inspections is improperly listed as exempt under Schedule G of the June 20, 1983 Decree. Although Vrdolyak occupies a supervisory position of considerable importance to the City, Vrdolyak's responsibilities in that position have limited and well defined objectives. *Cf. Elrod v. Burns,* 427 U.S. 347, 368, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976). Defendants have failed to establish that party affiliation is an appropriate requirement for the effective performance of the duties of the Assistant Director of Technical Inspections.

9. Although the job description for the Assistant Director of Technical Inspections,

on its face, appears to include broadly defined responsibilities, the testimony at trial reveals that the responsibilities are actually quite narrow in scope. For example, Vrdolyak's input into legislative changes is limited to assisting the Commissioner in complying with his statutory obligation of recommending necessary changes to the Building Code. All employees of the department share this duty. Furthermore, Vrdolyak has little input in the Department's fiscal policy with the sole exception of recommending fee schedules. Any fee schedule changes, however, must be approved by the Commissioner and the City Council. Finally, Vrdolyak's position does not involve highly sensitive subject matter nor does it require political loyalty. Vrdolyak was not made privy to confidential investigations regarding alleged bribery, but rather he was merely under a duty to report any information he obtained to the Commissioner. At that point, the City's Office of Municipal Investigations would investigate the allegations.

10. In summary, defendants have failed to establish that party affiliation is an appropriate prerequisite for the position of Assistant Director of Technical Inspections. Accordingly, the position of Assistant Director of Technical Inspections in the Department of Inspectional Services is improperly listed as an exempt position on Schedule G of the June 20, 1983 Decree.

### B. *The Political Firing Issue*

11. Plaintiff argues that his termination was politically motivated. Defendants argue that Vrdolyak was fired for cause. Specifically, defendants argue that Vrdolyak was terminated from his position for three reasons: (1) Vrdolyak was not functioning as the Assistant Director, but rather was functioning merely as the Chief of the Iron Section; (2) Vrdolyak lacked the necessary formal qualifications for the position in light of Commissioner Manley's desire to upgrade the professionalism of the Department; and (3) Commissioner Manley lost confidence in Vrdolyak's abilities when Vrdolyak failed to produce a

report on elevators and hoists which Manley requested.

■ 12. In order for an employee to establish a violation of the 1972 Consent Decree's bar against political firing, the employee must show by clear and convincing evidence that political considerations were a "substantial" or "motivating factor" behind the termination. *See Nekolny v. Painter*, 653 F.2d 1164, 1167–68 (7th Cir.1981); *McGuire v. City of Chicago*, 592 F.Supp. 56, 58 (N.D.Ill.1984). If the employee meets this burden, the burden of proof then shifts to the defendant to prove that the termination would have occurred even without political considerations due to valid, nonpolitical reasons for the firing. *Nekolny, supra,* 653 F.2d at 1167.

■ 13. In this case, Vrdolyak has established by clear and convincing evidence that political considerations were a motivating factor behind his discharge. Such motivation can be reasonably and properly inferred from the evidence produced at trial and summarized below. *See Petitions of Huels and Brennan,* No. 69 C 2145, slip op. at 5, (N.D.Ill. Feb. 11, 1981).

14. Defendants were aware of Vrdolyak's active involvement in the 10th Ward Regular Democratic Organization and his active support for former Mayor Jane M. Byrne. Furthermore, defendants were aware that Vrdolyak is the older brother of Edward R. Vrdolyak, Alderman of the 10th Ward and widely portrayed a principal political opponent of Mayor Washington.

15. On September 21, 1983 (slightly over one month prior to Vrdolyak's termination), Vrdolyak was interviewed by a consultant employed by the City ·and asked specifically if he was related to Alderman Edward R. Vrdolyak. At that time, the consultant and defendants believed that Vrdolyak could be fired for political reasons since his position was listed as exempt and "belonged to the Mayor."

16. On September 23, 1983, Acting Commissioner Manley issued a memorandum which stated, in part:

It shall be the policy of this administration that ability and demonstrated performance will be *the sole basis of retention and promotion.*

Defendants' Exhibit 31. (emphasis supplied) Given the fact that defendants have failed to establish that Vrdolyak's "ability and demonstrated performance" were anything less than "superior," it can reasonably be inferred that Vrdolyak's termination was motivated for reasons other than those stated in the September 23 Memorandum.

17. Vrdolyak was not offered a demotion or given an opportunity to secure other employment with the City. The termination letter fails to articulate any reason for Vrdolyak's termination.

18. The only explanation for Vrdolyak's termination offered by Acting Commissioner Manley at the time of the termination was that Vrdolyak's position "can be better served by someone else that is in concert with ... what my aims and applications are for the Department."

19. Based on the foregoing, the Court is convinced that Vrdolyak has sustained his burden of demonstrating by clear and convincing evidence that his termination was politically motivated.[4]

C. *The Termination "For Cause" Issue*

20. Since Vrdolyak has sustained his burden of showing his termination was politically motivated, the burden shifts to defendants to prove Vrdolyak would have been terminated for cause even absent the political motivations. Defendants have failed to sustain their burden on this point.

21. Defendants claim that Vrdolyak failed to perform the duties of Assistant Director, but rather performed solely as Chief of the Iron Section. This contention is based primarily upon the testimony of

---

**4.** Although the Court admitted plaintiff's Exhibit 125 (a newspaper article regarding a proposed layoff of 2,050 City employees in August of 1983) into evidence for the limited purpose of showing the state of mind of the defendants, the Court need not rely upon the article in finding that Vrdolyak's termination was politically motivated.

Deputy Commissioner William Browning. Browning, however, admitted that he neither reviewed Vrdolyak's performance evaluations nor talked with Vrdolyak prior to his termination. Browning testified that he believed Vrdolyak was failing to perform the duties of Assistant Director. Browning based that belief upon the fact that in the Director's absence, Browning's written communication to the Director would be answered directly by the section Chiefs and not by Vrdolyak. Browning admitted, however, that he did not actually know whether his correspondence was reviewed and acted upon by Vrdolyak and, consequently, he did not know whether or not Vrdolyak performed his duties as Assistant Director.

22. On the other hand, Vrdolyak testified as to the performance of his duties as Assistant Director. Specifically, Vrdolyak testified that he assisted the Director in the day-to-day performance of his duties, that he met with public groups as the Department's representative, that he suggested changes to the Building Code, that he undertook special assignments such as the inspection of the Chicago Hyatt House, and that he met with attorneys concerning court cases. Vrdolyak also testified that prior to his termination, whenever he acted in the Director's absence, all correspondence would be brought to him by the Director's secretary and that he would review it and direct it to the appropriate section chiefs and consult with them personally regarding any problems that might arise.

23. Former Commissioner Duggan testified that he recommended Vrdolyak for the position of Assistant Director and that he never received any information that Vrdolyak was not performing his job satisfactorily. Director Brick testified that Vrdolyak replaced Brick in Brick's absence whenever directed to do so and that Vrdolyak performed his duties satisfactorily. Brick also testified that, although he was Vrdolyak's immediate superior, no one had ever contacted him regarding Vrdolyak's termination and that he first learned of the termination in the newspaper in early November, 1983. Finally, the fact that Vrdol-

yak assumed "dual" positions of Assistant Director and Iron Chief does not justify termination for cause.

24. Based on all the foregoing, the Court finds that Vrdolyak did in fact perform his duties as Assistant Director, that he also performed essential and needed services with respect to supervising the Iron Section. Accordingly, termination for cause has not been demonstrated by defendants on the ground that Vrdolyak failed to perform the duties that were assigned.

25. The second justification advanced by defendants in support of their argument that Vrdolyak was terminated for cause is that he was unqualified for the position of Assistant Director in light of Acting Commissioner Manley's desire to upgrade the professional qualifications of the Department. Specifically, both Manley and Browning testified on behalf of defendants that they desired to replace Vrdolyak with a structural engineer or a person with equivalent qualifications. The record, however, does not support defendants' argument. First, with one exception, no one employed in the top ranks of the Department has the type of formal qualifications defendants purport to be seeking. The former Commissioner and Deputy Commissioner Nolan have a police background. Both Acting Commissioner Manley and Assistant Commissioner Browning admit they lack formal technical training. Director Brick, like Vrdolyak, has practical experience in construction, but lacks Vrdolyak's familiarity with large scale projects. Only Deputy Commissioner Kason is an engineer. Second, since Vrdolyak's termination, defendants have not hired a structural engineer, architect or similarly qualified person.. No such formally trained persons have been added to the Department. Third, although defendants argue that they were concerned with Vrdolyak's qualifications, both Manley and Browning admit they never examined Vrdolyak's personnel file, and Browning admits that neither he nor Manley even knew at the time of Vrdolyak's termination whether or not Vrdolyak was an engineer.

26. There is evidence in the record of Vrdolyak's extensive practical experience in the construction industry including particularly his experience as a project manager and his prior experience as an inspector. Defendants fail to offer any evidence that formal training is necessary for the position of Assistant Director or that Vrdolyak was hindered in the performance of his duties by the lack of formal training.

27. Based on all the foregoing, the Court specifically finds that defendants have failed to demonstrate that plaintiff was properly terminated for cause on the ground that he lacked sufficient formal qualifications for the job of Assistant Director of Technical Inspections.

28. The third argument advanced by defendants in support of their contention that Vrdolyak was terminated for cause is that Vrdolyak disregarded his duties by failing to submit a report allegedly requested by Acting Commissioner Manley. Manley testified that sometime in September or October, 1983, he received a complaint that inspectors from the Iron Section were making selective inspections on hoists for the Olympia Center project. Manley testified that he requested Vrdolyak to prepare and submit a report on the number of elevators serving buildings under construction and the frequency with which they were inspected. Manley further testified that he never received a report from Vrdolyak and that this affected his decision to terminate plaintiff.

29. Vrdolyak, however, testified that Manley never communicated the charge of selective inspections, and that Manley did not request a report regarding hoists. Vrdolyak stated that Manley only asked for a summary of the functions of the Iron Section.

30. On cross-examination, Manley testified that he asked for the report in mid-October, only two weeks before the termination letter dated November 2, 1983; that he did not state a specific date for submission of the report; that he did not state it was an urgent matter; and that he had no subsequent communication of any kind with Vrdolyak about the report.

31. The Court finds it unnecessary to resolve the conflict of testimony regarding the subject matter of the report since, even assuming Manley's testimony to be accurate, defendants have failed to demonstrate that Vrdolyak was properly terminated for cause on the ground that he failed to submit a report, the urgent or timely need for which was never communicated to him.

32. To the extent that any of the foregoing conclusions of law are deemed to be findings of fact, they are hereby adopted as findings of fact.

### III. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, it is hereby ordered that:

1. The position of Assistant Director of Technical Inspections in the Department of Technical Inspections is improperly listed as exempt on Schedule G of this Court's June 20, 1983 Consent Decree.

2. Plaintiff Peter Vrdolyak has sustained his burden of proving by clear and convincing evidence that political considerations were a motivating factor in his termination.

3. Defendants have failed to establish that Vrdolyak was terminated for cause.

4. Final judgment is hereby entered in favor of plaintiff and against defendants.

5. Plaintiff is entitled to recover against defendants costs and reasonable attorneys' fees. Plaintiff is hereby directed to file within 14 days of entry of this order his petition for costs and attorneys' fees.

6. Pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, the Court reserves the right to amend the above findings and conclusions or to make additional findings and conclusions upon motion of either party made no later than ten days from entry of this order.

IT IS SO ORDERED.