**William G. HERRON, Richard J. Egan, James R. Mc Kenna, William J. Murphy, Bruno Szwarzenski and Jerry A. Valenzio, Plaintiffs,**

v.

**CITY OF CHICAGO, an Illinois municipal corporation, Charles A. Pounian, as Commissioner of the Department of Personnel, John Corey, as Commissioner of the Department of Water, Wyman Porche, Manny Esteban and Michael A. Miller, Defendants.**

No. 83 C 4259.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 7, 1985.

William P. O'Loughlin, Diane MacArther, Edward T. Joyce, Joyce & Kubasiak, Chicago, Ill., for plaintiffs.

Richard Prendergast, Chicago, Ill., for defendant Miller.

Donald Hubert, James D. Montgomery, Corp. Counsel, City of Chicago, Chicago, Ill., for all other defendants.

## MEMORANDUM OPINION

WILL, District Judge.

This case was tried before the Court on the merits of plaintiffs' Third Amended Verified Complaint for violations of the 1972 *Shakman* consent decree. Plaintiffs alleged that the defendants promoted defendants Porche, Esteban, and Miller from Water Rate Takers (WRTs) to supervisors of WRTs based on political considerations and that the plaintiffs should have been, but were not promoted due to political considerations, in violation of the 1972 *Shakman* consent decree.

We decide three issues here. First, that the patronage prohibitions in the 1972 decree apply in the context of promotions; second, that government employees seeking a promotion do not violate the consent decree by soliciting or receiving the help and recommendation of political or other sponsors; and, finally, that, although the plaintiffs were deprived of equal consideration for promotion, the prohibition against patronage *promotions* was sufficiently ambiguous prior to 1984 that it would be unfair to hold the defendants in contempt of court for basing promotions on political considerations. For the reasons stated below, we hold that the *Shakman* consent decree prohibits the *Shakman* defendants from basing *promotion* decisions (except for those involving exempt positions) on or because of any political reason or factor. Second, we find that employees seeking a promotion have a first amendment right to talk to political and other sponsors and to seek their recommendations. Accordingly, defendants Porche, Esteban, and Miller are dismissed from the case. Finally, since plaintiffs and the remaining defendants have settled the remainder of this case, it is dismissed with prejudice and without costs.

### I

The original *Shakman* complaint "alleged that it was unconstitutional for public officials or political bodies to discharge or threaten to discharge employees under their control who refused to contribute money and work time to candidates supported by those officials or political entities." *Tomczak v. The City of Chicago*, 765 F.2d 633, 635 (7th Cir.1985). On May 5, 1972, the court approved and entered a consent decree which was intended to

> eliminate, for employees of local governmental entities, any coercion or employment discrimination based upon political considerations. The decree enjoined the *Shakman* defendants from "conditioning, basing, or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time a governmental employee, upon or because of any political reason or factor."

*Id. quoting* the 1972 Shakman consent decree *reproduced in Shakman v. Democratic Organization of Cook County,* 481 F.Supp. 1315, 1358 (N.D.Ill.1979). The court retained jurisdiction to determine, among other things, whether political sponsorship or other political considerations could lawfully be taken into account in hiring employees. 481 F.Supp. at 1358.

In 1979, the court found that the defendants in that case had illegally "conditioned, based, and affected the hiring of persons for governmental employment upon and because of their political sponsorship, affiliation, and support." *Shakman,* 569 F.Supp. 177, 178, *citing* 481 F.Supp. 1315 (N.D.Ill.1979). However, it was not until April 4, 1983 that the court entered a judgment enjoining political hiring. The injunction prohibited defendants from

> conditioning, basing, or affecting ... the hiring of any governmental employees ... upon or because of any political reason or factor including, without limitation, any prospective employee's political affiliation, political support or activity, political financial contribution, promises of such political support, activity, or financial contributions or such prospective employee's political sponsorship or recommendation.

*Shakman,* 569 F.Supp. 177, 179 (N.D.Ill. 1983).

The prohibitions of the 1972 consent decree as well as those of the 1983 order apply to various political and governmental entities, including the City of Chicago, and the "elected leaders and the officers, members, agents, servants, employees, and attorneys of each of the defendants, ... and all others in active concert or participation with any of them who receives actual notice" of the respective judgments. *See* 481 F.Supp. at 1357–58 (1972 decree); 569 F.Supp. at 179 (1983 order). Both the 1972 decree and the 1983 order enjoined the defendants from "knowingly inducing, aiding, abetting, participating in, cooperating with, or encouraging the commission of any act which is proscribed," and from threatening to commit any of the pro-scribed acts. *See* 481 F.Supp. at 1358; 569 F.Supp. at 179–80.

■ In a civil contempt proceeding such as this one, to establish a violation of the 1972 consent decree's bar against adversely affecting any aspect of a governmental employee's job because of any political reason or factor, the plaintiffs must show by clear and convincing evidence that political considerations were a substantial or motivating factor behind the action which adversely affected the employee's job. *See, e.g., United States v. Huebner,* 752 F.2d 1235, 1241 (7th Cir.1985); *Nekolny v. Painter,* 653 F.2d 1164, 1167–68 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Vrdolyak v. City of Chicago,* 604 F.Supp. 1325, 1332 (N.D.Ill.1984). If the plaintiffs meet this burden, the burden of proof then shifts to the defendants to prove that the event which adversely affected an aspect of the governmental employee's job would have occurred even without the political considerations, due to valid nonpolitical reasons. *See Nekolny,* 653 F.2d at 1167; *Vrdolyak,* 604 F.Supp. at 1332. A person accused of violating a court order, however, may not be punished for contempt unless the terms of such order are clear and specific, and leave no doubt or uncertainty in the minds of those to whom it is addressed as to what the order requires or prohibits. *See United States v. Joyce,* 498 F.2d 592, 596 (7th Cir.1974); *McFarland v. United States,* 295 F. 648, 650 (7th Cir.1924).

## II

In this case, the six plaintiffs claim that the promotions of three Water Rate Takers to supervisors of Water Rate Takers were politically motivated in violation of the 1972 *Shakman* consent decree. The six plaintiffs are WRTs in the Department of Water. Defendants, Porche, Esteban, and Miller were WRTs who were promoted to supervisors of WRTs.

On March 1, 1982 the City of Chicago announced an examination for the position of Supervisor of Water Rate Takers that was "open until further notice." Pl.Ex. 1.

In April of 1982 each plaintiff, and defendants Miller and Porche were found eligible to take the examination. On June 26, 1982 about 25 people, WRTs, members of the public, and non-WRT employees of the City took the exam.

In July of 1982, the results of the exam were posted, and the six plaintiffs plus two other WRTs who had taken the exam, Gesswein and Kroll, were rated qualified and placed on the eligibility list, as was Porche who did not take the exam because he was told he was qualified based on his experience as a provisional supervisor since August 1, 1981, and therefore, did not have to take the exam. Miller had signed up to take the exam, but did not because he overslept. Esteban had not signed up to take the exam because he did not know about it. Miller and Esteban each arranged to take the exam in late December, 1982 or in early January, 1983. Each was found qualified and placed on the eligibility list along with the others previously listed.

The June 1982 exam was an original exam, open to anyone, and, under Department of Personnel practice, could be given on a continuous basis. There is apparently nothing unusual or irregular about the exam being given to a person after the June 26 date. The exam is a "biographical employment evaluation form." It is not a test of skills, rather it is merely a review of past experience relevant to the position, essentially an expanded application form. Such "credentials" exams are now classified as unassembled exams and are mailed out to applicants. In June of 1982, the exam was new and was given under supervision so that any questions applicants might have could be answered.

**Porche's Promotion**

Until at least August, 1980, Porche had been a precinct captain in the 34th Ward Democratic Organization. In 1978 or 1979 Superintendent of Water Collections, Nihill, told Porche that supervisors jobs would be opening up, that Porche was qualified, and that Nihill would like to see him get one of the jobs. Nihill told Porche that he should talk to anyone who could help him. Porche informed State Senator Emil Jones, Jr., who was a member of the 34th Ward Democratic Organization, of his interest in a promotion to Supervisor of WRTs. And, in a very short conversation in the corridor of City Hall, Porche recalls telling Wilson Frost, Alderman and Ward Committeeman of the 34th Ward, of his interest in the promotion, and asked Frost to recommend him for the job and to be a character reference for him. According to Porche, Frost replied that he would look into it.

Frost, understandably, does not remember the brief conversation, and there is no evidence that either Frost or Jones or anyone else in the 34th Ward Democratic Organization did anything in 1978 or 1979 to help Porche get promoted. Two or three years later, on August 1, 1981, Porche was provisionally appointed Supervisor of WRTs. Neither Frost nor Jones, or any other person ever took credit for getting Porche the promotion. When Jones was told, he said: "Well deserved." Frost was never informed of the promotion.

Prior to the June 26, 1982 Supervisor Exam, Assistant Superintendent of Water Collection, Clark, told Porche that because he had been working as a supervisor since August 1, 1981, and was doing a very good job, he was qualified and need not take the exam on June 26, 1982. Porche was rated qualified, and on September 16, 1982 he was appointed as a probationary supervisor of WRTs. A year later he obtained permanent career service status as a supervisor.

**The Promotions of Esteban and Miller**

Since 1978, Esteban has served as a precinct captain for the 33rd Ward Democratic Organization where Richard Mell is Alderman and Committeeman. Esteban did not apply to take the June 1982 Supervisor exam because he did not know about it. When a fellow WRT told him about the exam, Esteban telephoned the Department of Personnel and was told that the exam was no longer available. However, since the exam was still posted as "open until further notice," Esteban went to see Alderman Mell who accompanied him to the Department of Personnel on December 20,

1982, at which time he was allowed to submit an application. He took the exam a week later, was found qualified, and placed on the eligibility list.

From 1969 to 1981 Miller served as a precinct captain for the 12th Ward Democratic Organization. In 1981, Miller became a precinct captain for the 13th Ward Democratic Organization. He signed up to take the Supervisor exam given on June 26, 1982, but overslept and did not take it at that time. In December of 1982 he was called by someone in the Department of Personnel who asked him if he still wanted to take the exam. Miller replied that he did and scheduled the exam which he took on January 13, 1983. Miller was also found qualified and placed on the eligibility list.

In December, 1982, prior to the time Esteban and Miller attempted to schedule their make-up exams, the City Council passed the Annual Appropriations Ordinance for 1983 which allocated funds for the creation of· two new Supervisor of WRTs positions. Sometime between then and February 1, 1983, the date Esteban and Miller were appointed probationary Supervisors of WRTs, someone within the 33rd Ward Democratic Organization contacted someone within the Mayor's Office and recommended Esteban to be considered for appointment to the position of Supervisor of WRTs. Similarly, someone within the 13th Ward Democratic Organization contacted someone within the Mayor's Office and recommended Miller to be considered for appointment to the position of Supervisor of WRTs.

Thereafter, James Richmond, assistant to the Chief of Staff for Mayor Byrne, called Karen Schroeder, supervisor of personnel services for the Department of Water, and asked about the possibility of promoting Esteban and Miller to Supervisors of WRTs. After discussing with Commissioner Corey the fact that Esteban and Miller were not then on the eligibility list, Schroeder called Robert Joyce, Deputy Commissioner of Personnel, who told her that the exam was closed but that late

applications were possible. Schroeder knew this to be part of the Department of Personnel's standard procedures. On Corey's instructions, Schroeder then informed Richmond that Esteban and Miller were not on the eligibility list. Afterwards, Esteban and Miller each arranged to take the Supervisor Exam, and were placed on the list.

Once the Department of Personnel informed the Department of Water that Esteban and Miller were on the eligibility list, Schroeder discussed the promotions to Supervisor of WRTs with Commissioner Corey, reminding him of the call or calls from the Mayor's Office inquiring about Esteban and Miller. Corey appointed Esteban and Miller to the newly created Supervisor positions. Corey testified that, if his department found a person qualified, and if they were on the eligibility list, a call from the Mayor's Office would be the deciding factor.

In this case, Esteban and Miller were found qualified by the department and were on the eligibility list. Plaintiffs were also qualified and on the eligibility list. Esteban and Miller were appointed to the supervisor positions instead of any of the plaintiffs or other qualified people on the eligibility list because Corey's office received a call from the Mayor's Office recommending Esteban and Miller, and did not receive such a call recommending any of the others. Corey also testified that he did not assume that a call from the Mayor's Office recommending or making an inquiry was always politically motivated or for patronage reasons.

### III

#### Liability under the 1972 Decree

It is clear that plaintiffs have stated a claim under the 1972 *Shakman* Consent Decree. As Judge Bua pointed out in this case in denying defendants' motion to dismiss:

> [T]he actions complained of herein are within the ambit of the 1972 decree. First, the Court notes that each plaintiff is an employee of the City. Moreover, at

some point, each was qualified for the Supervisor position as measured by objective prerequisites. Finally, the positions sought by the plaintiffs were of the very sort which a Water Rate Taker might expect to gain once he had proven himself qualified at his position. The plaintiffs' predicaments were thus quite different from those of an individual who is not a City employee who seeks to be newly hired. Clearly, by failing to place the plaintiffs in the desired positions, defendants prejudiced or affected the plaintiffs' term of employment so as to expose themselves to [potential] liability under the 1972 decree.

*Herron v. City of Chicago,* 591 F.Supp. 1565, 1567 (N.D.Ill.1984). This is the law of the case.

The essential purpose of the 1972 decree was to free government employees from all coercion and employment discrimination based on political considerations. *See* 569 F.Supp. at 178, *citing* 481 F.Supp. at 1356. Its focus originally was to prohibit retaliation, usually discharge, against government employees based on political considerations. The rationale of the prohibition against patronage firings in the decree was that at least some aspects of both a "candidate's right to an 'equal chance' and a voter's right to an 'equally effective voice' are entitled, under the equal protection clause, to protection" from state action in the form of invidious official discrimination. 481 F.Supp. at 1322, 1340.

Both interests are impaired by the misuse of official power over public employees because such misuse of official power can create a "substantial, perhaps massive, political effort in favor of the ins and against the outs." *Id.* at 1322, *quoting Shakman,* 435 F.2d 267, 270 (7th Cir.1970), *cert. denied,* 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971). The Cook County Democratic Organization's ability to coerce political work or contributions from patronage employees with the threat of firing or other adverse effects on the employee's government job was indeed a powerful weapon which the 1972 decree prohibited.

In the most simple terms, the 1972 decree prohibited political organizations from using patronage as a "stick" against governmental employees.

Likewise, the 1983 order banning reliance on political considerations in the hiring context eliminated political organizations' ability to use patronage as a "carrot" to reward those who did political work, and pay for it from the public coffers. The ability of the Cook County Democratic Organization to condition the recommendation or sponsorship necessary to obtain a job on either the fact of past, or the expectation of future political work or financial contributions was a powerful political reward which benefitted those in power to the detriment of an opposition candidate's right to an equal chance and a voter's right to an equally effective voice under the equal protection clause. Thus, in 1983 the court enjoined the defendants from hiring or refusing to hire employees based on political considerations.

Under the rationale of the 1972 decree, promotions based on political considerations are also prohibited. Under the 1972 decree, the defendants are prohibited from retaliating against governmental employees by denying them promotions because they failed to do political work for, contribute money to, or be affiliated with the Democratic Organization and thereby failed to gain the political sponsorship of a functionary of the Democratic Organization.

In the context of this case, the 1972 decree prohibits a decision to promote a WRT merely because he has gained the political recommendation of the Democratic Organization and to deny promotion to those who have not gained such a recommendation. Likewise, the 1983 order would prohibit, as patronage hiring, a decision to give the supervisor's job to a qualified person who was *not* an employee of the City based on that person's having gained a political recommendation.

Not until Judge Bua's 1984 ruling in this case, however, was there a specific holding that promotions among existing

city employees were not to be based on political sponsorship or other political considerations. It is now clear that discharge, hiring and promotion are all within the ambit of the *Shakman* decree.

### Liability of the Promoted Supervisors

■ The defendants argue, correctly, that defendants Porche, Esteban, and Miller did not violate the 1972 decree by either seeking or receiving, if they did, the recommendation of party leaders for whom they had done voluntary political work in the past. An individual employee seeking a promotion, like a volunteer political worker seeking a government job, has a first amendment right to speak to political leaders and to seek their recommendations for such employment or promotion. However, it is appropriate to bar political leaders and governmental officials from ever including consideration of an individual's past history of precinct or other political work or financial contribution, or the lack thereof, in any employment decision whether it be a decision to hire, fire, or promote. *See, e.g.,* 481 F.Supp. at 1341, n. 28.

■ On the other hand, individuals who were initially hired because of their political work can continue to do voluntary political work. And government officials may hire or promote such persons unless such decision is based on political considerations. *See, id.; Shakman,* 607 F.Supp. 1086, 1087 (N.D.Ill.1985). Likewise, political leaders may recommend such persons for a government job or promotion, unless the recommendation is based on political factors and the decision is substantially motivated by such political considerations. As Judge Bua recently pointed out, the decree does not exclude "party leaders from any role in the hiring process." Nor does it exclude them from any role in the promotion process. Although the

> Decree does prohibit the existing system by which hiring [or promotion] decisions are delegated to ward and township committeemen, the Decree does not prohibit party leaders from disseminating public information concerning job openings [in-

cluding promotional opportunities], referring people to employment offices of the defendants, or even from recommending persons about whom they have specific job related information. The Decree simply prohibits hiring [and promotion] which gives political recommendations more weight than other relevant recommendations (including recommendations of rival political groups).

*Shakman,* 607 F.Supp. at 1087.

■ Like the person seeking a job in a hiring case, the employees seeking promotion in this case are not in a position to affect the decision to hire or promote, and therefore are not in a position to violate the decree. Though the employee seeking a promotion does not violate the decree by seeking a recommendation from a political leader or government official, the political leader or government official violates the decree if he or she conditions the recommendation on the fact of past, or the promise of future, political work, support, affiliation, financial contribution, or the like, and such political reason or factor is a substantial or motivating factor in the decision to promote.

Porche is not in contempt of court because he was not in a position improperly to affect the decision to promote him. In addition, it is apparent that his alleged political sponsors, Frost and Jones, did nothing. There is no evidence that Frost or Jones or anyone else recommended Porche for the provisional supervisor job. Moreover, some two or three years elapsed between his conversations with Jones and Frost and his promotion to provisional supervisor. Therefore, there was no political factor which could have been a substantial or motivating factor in the decision to promote Porche. Porche must, therefore, be dismissed from the case.

■ The promotions of Esteban and Miller were clearly substantially motivated by political considerations. The only reasonable inference from the evidence is that the calls from "someone" in the 13th Ward Democratic Organization and "someone" in

the 33rd Ward Democratic Organization to the Mayor's Office, and the subsequent call or calls from the Mayor's Office to the Department of Water recommending Esteban and Miller for the supervisor positions and requesting that they be promoted, would not have been made unless Miller and Esteban had done political precinct work for the respective Democratic Ward Organizations in the past, or unless the respective ward organizations expected that Esteban and Miller would do such work in the future. Thus the first element of a *Shakman* promotion violation exists.

Furthermore, it is undisputed that political considerations were a substantial or motivating factor in Commissioner Corey's decision to promote Miller and Esteban. He frankly stated that, given a pool of qualified employees, he would promote the one or ones recommended by the Mayor's Office. Thus, the second element of a *Shakman* violation also exists. However, as we pointed out above, neither Miller nor Esteban was in a position to affect the decision, and neither could be in violation of the decree. Both deny that they asked for recommendations from their ward organizations, although someone in each Organization tried to affect the promotion decision based on political considerations. Neither Miller nor Esteban would be in contempt even if he had requested a recommendation from his ward committeemen, though by acting on the request the ward committeemen might well violate the *Shakman* decree. Thus, both Miller and Esteban must also be dismissed from the case as defendants.

### Ambiguity as a Defense

We need not decide the potential liability of the remaining defendants, Pounian, Corey, and the City of Chicago. These defendants have settled with the plaintiffs in light of the Court's tentative finding of ambiguity as a possible defense to contempt. That settlement, we believe, was a fair resolution of the equitable elements of the case. Obviously, the six plaintiffs could not all have been promoted to two positions. In addition, four other WRTs including Esteban and Miller were on the eligibility list and might have been promoted without regard to political considerations, Without conceding liability, the City, not relying solely on a possible legal defense, has recognized the equitable considerations in the somewhat complex facts of the case and we commend its counsel for doing so.

### Conclusion

For the reasons stated above we reaffirm Judge Bua's 1984 holding that patronage promotions, as well as hirings and firings, are prohibited under the terms of the 1972 decree as clarified by the 1983 order. Government employees, however, have a first amendment right to talk to and to seek recommendations for promotions from government officials and political leaders, and do not violate the terms of the decree by doing so. Therefore, defendants Porche, Esteban, and Miller are dismissed from the case. Finally, the settlement between the plaintiffs and the remaining defendants concludes the case and requires its dismissal with prejudice and without costs. An appropriate order will enter.