Donald C. TOMCZAK,
Plaintiff-Appellee,

v.

The CITY OF CHICAGO, an Illinois Municipal Corporation,
Defendant-Appellant.

Nos. 84–1490, 84–1713 and 84–1894.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1984.

Decided June 17, 1985.

Rehearing and Rehearing En Banc Denied Aug. 5, 1985.

See also, D.C., 586 F.Supp. 959.

---

Patrick T. Murphy, Chicago, Ill., for plaintiff-appellee.

Jerold S. Solovy, Jenner & Block, Chicago, Ill., for defendant-appellant.

Before FLAUM, Circuit Judge, PELL and WISDOM,* Senior Circuit Judges.

PELL, Senior Circuit Judge.

Defendant below, the City of Chicago, appeals from the district court judgment in favor of plaintiff, Donald C. Tomczak, holding that appellant had violated the *Shakman* decree, which controls the use of political patronage in appellant's employment practices. Appellant raises three issues on appeal. The first issue is whether the district court erred in holding that the position occupied by appellee was not exempt from the strictures of *Shakman*. Second, even

---

* John Minor Wisdom, Senior Circuit Judge for the Fifth Circuit, is sitting by designation.

if the position is subject to *Shakman*, appellant maintains that the district court was clearly erroneous in finding that appellee's discharge was politically motivated and not for just cause. Finally, appellant objects to the remedy ordered by the district court.

## I. HISTORY OF THE *SHAKMAN* LITIGATION

In 1970, this court reversed the district court's dismissal of Shakman's complaint and held that the complaint stated a justiciable cause of action and contained factual averments sufficient to survive a motion to dismiss. *Shakman v. Democratic Organization of Cook County*, 435 F.2d 267 (7th Cir.1970), *cert. denied*, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971). The complaint alleged that it was unconstitutional for public officials or political bodies to discharge or threaten to discharge employees under their control who refused to contribute money and work time to candidates supported by those officials or political entities.

A consent decree, entered in May 1972, attempted to eliminate, for employees of local governmental entities, any coercion or employment discrimination based upon political considerations. The decree enjoined the *Shakman* defendants from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time a governmental employee, upon or because of any political reason or factor." Reproduced in *Shakman v. Democratic Organization of Cook County*, 481 F.Supp. 1315, 1358 (N.D.Ill.1979). The district court retained jurisdiction of the case to enable the parties to enforce compliance with the decree and to resolve a number of still-disputed issues, including whether

> [c]ertain governmental employment positions ... by their nature involve policy-making to such a degree or are so confidential in nature as to require that discharge from such positions should be exempt from inquiry under this Judgment. Jurisdiction is maintained to litigate the question of which governmental employment positions under such defendants' jurisdiction are so exempt for the foregoing reasons.

*Id.* at 1358–59.

Shortly thereafter, various defendants, who had refused to enter into the decree, filed motions to dismiss. The district court granted the motions concerning those portions of the complaint that challenged the hiring and firing of patronage employees based solely upon the political affiliation of the employee. *Shakman v. Democratic Organization of Cook County*, 356 F.Supp. 1241, 1244–49 (N.D.Ill.1972). The district court reasoned that a newly elected or appointed official could replace employees of his predecessor based solely upon political affiliation, as long as he did not use hiring and firing practices to coerce political work or contributions. The United States Supreme Court subsequently has held that employees in nonpolicymaking and nonconfidential positions who are victims of patronage dismissals state a cause of action under the First and Fourteenth Amendments. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *id.* at 374–75, 96 S.Ct. at 2690 (Stewart, J., concurring).

In 1979, the district court again addressed the patronage practices, particularly in hiring decisions, of those defendants who had not entered the 1972 consent decree. *Shakman v. Democratic Organization of Cook County*, 481 F.Supp. 1315 (N.D.Ill.1979). The court held that "the challenged patronage practices give the defendants an actual, significant advantage in elections" and, therefore, infringe the First and Fourteenth Amendment rights of the plaintiff candidates and voters. *Id.* at 1345. The court further held "that the non-consenting defendants have independently infringed the plaintiffs' constitutional rights through their use of patronage hiring, firing, and promotion practices, as well as through their conspiracy with the consenting defendants to practice and further patronage hiring practices." *Id.* at 1349 (footnote omitted). In a footnote,

however, the court added the following caveat:

It is the court's understanding that the plaintiffs are not challenging the defendants' use of political considerations in their employment decisions concerning policymaking officials, *see Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir.), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977). The court's decision today does not affect government employees who are in that category.

*Id.* at 1353 n. 46.

In a later decision, the district court adjudged "the hiring aspects of the *Shakman* case." *Shakman v. Democratic Organization of Cook County*, 569 F.Supp. 177, 178 (N.D.Ill.1983). The court noted that the 1983 judgment attempted "to eliminate political considerations in the hiring of government employees." *Id.* The judgment included the following paragraph labeled "Exempt Positions":

Defendant Public Employers may, from time to time, apply to the Court for a determination that political party affiliation or activity are appropriate requirements for the effective performance of certain Governmental Employment positions and therefore hiring for or discharge from such positions should be exempt from inquiry under this Judgment and the Consent Judgment.

*Id.* at 182. In an appendix added to the opinion two months after the judgment, the district court, by motion of the City of Chicago and with the consent of the *Shakman* plaintiffs, supplanted the earlier judgment with respect to the city and its mayor. The substantive provisions of the amended judgment were substantially similar to the earlier judgment, except for portions related to the exempt positions. The new judgment exempted approximately 1,200 city employees from the application of the *Shakman* decree. Included in the exempt list, known as Schedule G, were approximately thirty-three positions in the Department of Water, including the Assistant

Commissioners of the Department, the First Deputy Commissioner of Water, and the Deputy Commissioner of Water Services. The district court also retained jurisdiction of the case

to consider petitions requesting, for good cause, that particular positions listed in Part G should be deleted from the Schedule and to give such other relief as may be appropriate....

No action taken with respect to any position while it remains on the Schedule shall be considered contempt of this Court under the 1972 Consent Judgment.

*Id.* at 207.

## II. THE FACTS AND DISTRICT COURT PROCEEDING

### A. The Termination.

Plaintiff began to work for the City of Chicago in 1958 and gradually worked his way up from a laborer's position to that of First Deputy Commissioner of the Department of Water. On November 16, 1983, plaintiff was terminated from his position as First Deputy Commissioner. Plaintiff then filed suit in the district court pursuant to the *Shakman* decree. He alleged that political motivations led to his dismissal in violation of the decree and that the district court had improperly included his position in Schedule G.

With respect to the allegedly politically motivated dismissal, the parties introduced a wide variety of evidence. Plaintiff attempted to establish that his relationship with John Corey, his superior and the Commissioner of the Department of Water, had always been professional and cordial until, without forewarning, Corey dismissed plaintiff. Plaintiff maintained that the mayor of the City of Chicago, or his associates, determined that plaintiff should be dismissed so that the mayor could replace him with someone who had political allegiance to the new administration. The evidence demonstrated that, less than one month after Corey sent a memorandum to the city's Bureau of Budget requesting that plaintiff's salary level be maintained, Corey terminated plaintiff, with blind cop-

ies of the termination letter sent to the corporate counsel, the mayor's chief assistant, and the mayor's press secretary.

A key witness at the trial was Thomas Bower, an engineer and Assistant Commissioner in the Department, acknowledged by both sides to be a professional employee without political allegiance to any faction of the city's fragmented Democratic party. Bower testified that he never had heard Corey criticize plaintiff and that the two men had "a very good working relationship." Although Bower often acted as a liaison between Corey and plaintiff, there were also direct phone calls and at least one face-to-face meeting between the two each week. Bower could not believe that Corey would have terminated plaintiff for political reasons.

Corey, in his trial testimony, attributed the dismissal to a failure of communication and to a verbal confrontation that he had had with plaintiff in 1979, when plaintiff was the Deputy Commissioner in the Department. According to Corey, the two men later met with then Mayor Byrne, who reprimanded plaintiff, which Corey thought was an inadequate response. Plaintiff denied that the meeting ever took place. Later, in 1981, plaintiff received a promotion, made without consulting Corey, to First Deputy Commissioner, which made him second in command in the Department. The promotion resulted in higher pay for plaintiff, although he testified that he had no additional duties.

As to the communication failure, Corey testified that plaintiff forbade his staff members to communicate with Corey or his staff without plaintiff's permission and that plaintiff failed to provide Corey with essential information. The Commissioner of Personnel under Mayor Washington testified that he was aware of an antagonistic relationship between plaintiff and Corey, which had resulted in several complaints by Corey. Corey maintained that, for all these reasons, and because he wanted to institute changes in plaintiff's Bureau that, he felt, necessitated changing the head of the Bureau, he made the unilateral decision

to terminate plaintiff, without direction from Mayor Washington's administration and not based upon any political reasons. Plaintiff, on the other hand, testified that, aside from the unfortunate verbal confrontation in 1979, his working relationship with Corey was excellent. Plaintiff did not have any direct evidence that his removal was politically motivated, but, as he testified, "I just can't believe that it was Mr. Corey [who made the decision]. I just can't."

There was no evidence introduced at trial to show to which faction of the Chicago Democratic Party either Corey or plaintiff owed his allegiance, nor was there any direct evidence that the dismissal was due to political motivations. The circumstantial evidence, which plaintiff offered to establish a politically motivated discharge, amounted to several things: first, Corey sent copies of plaintiff's termination letter to a number of high ranking officials in the mayor's office; second, neither Bower nor plaintiff could conceive of any reason, other than political considerations, why Corey would dismiss plaintiff, and both testified that a good working relationship had always existed between plaintiff and Corey; third, Corey had never criticized plaintiff's work in writing and only once orally a number of years earlier, despite numerous opportunities to present his alleged dissatisfactions to the mayor's office; and, finally, the city made no effort to find plaintiff, a public servant for twenty-five years, an alternative position.

The district court found that plaintiff's termination was politically motivated. The court made oral findings of fact and conclusions of law. None of the findings relate to the question of political motivation, and the only conclusion on that subject was: "That the petitioner has met his burden in demonstrating by clear and convincing evidence that his termination was politically motivated."

B. The Exempt Position.

The dictates of the *Shakman* decree and the applicable Supreme Court cases placed

the parties in the somewhat anomalous position of plaintiff trying to downplay the importance of his job while defendant sought to establish its importance. Corey, the Commissioner of the Department, reports directly to the mayor. The Department has three divisions, of which the Bureau of Water Distribution is one. Plaintiff's job as First Deputy Commissioner made him the highest level employee in the Bureau of Water Distribution. Although plaintiff's immediate office staff had only nine employees, the Bureau has 1,150 employees and an annual budget of approximately $40,000,000. Furthermore, whenever the Commissioner was absent, the First Deputy would assume the Commissioner's duties.

The Bureau has responsibility for capital construction projects as well as repair and rehabilitation of existing capital structures. The primary goal of the entire Water Department is to assure that adequate water supplies reach homes and businesses as cheaply and efficiently as possible. The Commissioner testified that decisions about which facilities to repair or replace were never made for political reasons.

Plaintiff sought to establish that, although his job had great authority and responsibility, he could not thwart the goals of the new administration or set policy. Similarly, Bower testified that plaintiff's input could not jeopardize the mayor's ability to administer the city. Plaintiff maintained that his job functions were routine and did not include policymaking. According to plaintiff, the Commissioner had final authority, and plaintiff had to consult him, with respect to any decision to install water meters, cut off service, transfer and appoint employees within plaintiff's Bureau, and other relatively mundane tasks. As to new construction, the Engineering Department, which was part of plaintiff's Bureau, would develop plans and present them to plaintiff, who would approve the plans and then send them to Corey. There was no evidence that either plaintiff or Corey ever altered any engineering plans. Even Corey had to defer to the City Council to determine if and when new construc-

tion would take place. Bower's testimony was that plaintiff's "responsibilities are primarily as a manager in the Bureau of Water Distribution. He operates, more or less, under certain guidelines."

Defendant introduced a variety of evidence to establish the exempt status of plaintiff's position. A study rating the relative importance of all city management jobs rated plaintiff's job as one of the top fifty positions in city government. Plaintiff's salary was $62,000 per year, second only to Corey among all employees of the Water Department. Corey and the Commissioner of Personnel both testified that plaintiff's position carried great responsibility in both policymaking and policy implementation. Corey testified that, while he had final decisionmaking authority in most areas, plaintiff had initial responsibility for capital construction, new construction plans, budget requests, and the repair and maintenance of equipment. Corey stated that he would be unable to make policy decisions without recommendations and input from his First Deputy. Bower also testified that the First Deputy's input was very important to the Commissioner's decisionmaking.

In his own evaluation of his position, prepared in 1980, plaintiff attributed thirty percent of his job responsibilities to "[p]lan[ning], develop[ing] and recommend[ing] budget requirements for the Bureau," which requirements, plaintiff acknowledged, Corey usually accepted without changes. Plaintiff allocated the balance of his job responsibilities as follows: forty percent to "[m]anag[ing] the execution of the Bureau's maintenance and construction programs," twenty percent to "[r]ecommend[ing] to the Commissioner, the Bureau's Capital Improvement Program for the replacement and improvement of the distribution system," and ten percent to "[d]evelop[ing], coordinat[ing] and control[ling] the Bureau's activities to achieve its short- and long-range goals." Corey testified that plaintiff had significant responsibility in the allocation of personnel and financial resources and could frustrate

execution of administration policies concerning the Water Department.

Corey further testified that political affiliation and loyalty were important factors in the choice of a First Deputy. Similarly, Bower stated that the personal loyalty of a First Deputy for the Commissioner was a crucial determinant in filling the position. Finally, the Director of Personnel, who characterized the position of First Deputy as a high-level, policymaking job, concurred in Corey's assessment that political affiliation was important for an employee in plaintiff's position.

The district court's findings with respect to the issue of exempt status were substantially more extensive than on the question of political motivation. Initially, the court found

> that, while the petitioner had broad policymaking decisions, these related to the repair and rehabilitation of the water system within the City of Chicago. None of these decisions involved such decisionmaking in which there would be room for principled disagreement on goals or their implementation, nor that this type of input would jeopardize the ability of the new officer, or the new Mayor in this case, to run his office.

Although finding that plaintiff's job "included the responsibility for all Bureau of Water activities as they relate to the operation, maintenance, repair, and new construction of the water distribution system which included assisting and formulating and disbursing a budget of approximately $40 million," the court went on to find that plaintiff had "no policymaking role at all in new construction." Furthermore, the job was "an essential and needed position." The court also found that

> the position of First Deputy Commissioner of the Department of Water is not properly listed as an exempt position in Schedule G ..., in that the position does not involve policy to such a degree nor is it so confidential in nature with regard to policy, and is not a public office where party affiliation is such an appropriate requirement for the effective perform-

ance of the office involved that employment decisions concerning the position are required to be exempt from inquiry under the 1972 Consent Decree.

Finally, the court's first conclusion of law stated that defendant "has failed to meet its burden to establish that the position held by petitioner ... is properly listed as an exempt position."

Having concluded that plaintiff's position was not exempt and that his termination was politically motivated, the district court held defendant in contempt for violation of the *Shakman* decree.

## III. THE DECISION

Case law has established, and defendant does not contest, that the clearly erroneous standard of review, Fed.R.Civ.P. 52(a), applies to a district court's determination whether a particular government position is exempt from restrictions on politically based employment decisions. *Soderbeck v. Burnett County, Wisconsin*, 752 F.2d 285, 288–89 (7th Cir.1985); *Shakman v. Democratic Organization of Cook County*, 722 F.2d 1307, 1310 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 279, 78 L.Ed.2d 258. *Accord Jones v. Dodson*, 727 F.2d 1329, 1336 (4th Cir.1984); *Gibbons v. Bond*, 668 F.2d 967, 969 (8th Cir.1982); *Stegmaier v. Trammell*, 597 F.2d 1027, 1034 n. 8 (5th Cir.1979). Consequently, this court may reverse the district court's finding that plaintiff's position was not exempt only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). *Accord Anderson v. City of Bessemer City, North Carolina*, —— U.S. ——, ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

Two Supreme Court cases establish the framework for the analysis of questions about employment decisions of governmental entities based upon political affiliation. In the first, *Elrod v. Burns*, a plurality of the Supreme Court condemned, on First Amendment grounds, the patronage dismis-

sals of nonpolicymaking employees, but allowed such dismissals of policymakers "to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." 427 U.S. at 367, 96 S.Ct. at 2686, 49 L.Ed.2d 547 (1976). In an attempt to distinguish policymakers from nonpolicymakers, the plurality stated: "An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position.... [C]onsideration should also be given to whether the employee acts as an advisor or formulates plans for the implementation of broad goals." *Id.* at 368, 96 S.Ct. at 2687. In a limiting concurrence necessary to establish a majority of the Court, Justice Stewart stated that "a non-policymaking, nonconfidential government employee can [not] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id.* at 375, 96 S.Ct. at 2690 (Stewart, J., concurring in the judgment).

The plurality opinion in *Elrod* relied, in large part, upon an earlier case in this court, in which the opinion noted that political affiliation is a legitimate "criterion in the selection of policy-making officials" and that "considerations of personal loyalty ... may justify the employment of political associates in certain positions," but those factors would not apply to "positions such as janitors, elevator operators or school teachers." *Illinois State Employees Union, Local 34 v. Lewis,* 473 F.2d 561, 574 (7th Cir.1972) (Stevens, J., with one judge concurring in the result), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590, and 410 U.S. 943, 93 S.Ct. 1370, 35 L.Ed.2d 609 (1973).

■ In the second opinion, the Supreme Court abandoned the labels of "policymaker" and "confidential employee" for a more functional analysis. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The Court stated: "rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the office involved." *Id.* at 518, 100 S.Ct. at 1294. Thus, only if political loyalty is "essential to the discharge of the employee's governmental responsibilities," *id.,* can his patronage dismissal survive a First Amendment challenge. Under its new formulation, the Court held that "the continued employment of an assistant public defender cannot properly be conditioned upon allegiance to the political party in control of county government," *id.* at 519, 100 S.Ct. at 1295, because, in contrast to a public prosecutor who has broader public responsibilities, *see Livas v. Petka,* 711 F.2d 798, 799–801 (7th Cir.1983), the assistant public defender's primary responsibility is to serve the needs of individual clients.

■ Preliminarily, we note that, although *Branti* addressed the problem of the termination, by a newly appointed Democratic Public Defender, of the assistants of the prior Republican Public Defender, its reasoning applies with equal force to patronage dismissals when one faction of a party replaces another faction of the same party, *see, e.g., Joyner v. Lancaster,* 553 F.Supp. 809 (M.D.N.C.1982); *Ecker v. Cohalan,* 542 F.Supp. 896 (E.D.N.Y.1982), especially in election districts where a primary victory within the dominant party virtually assures victory in the subsequent general election, *see, e.g., Barnes v. Bosley,* 745 F.2d 501, 506 n. 2 (8th Cir.1984); *McBee v. Jim Hogg County, Texas,* 703 F.2d 834, 838 n. 1 (5th Cir.1983), *vacated en banc on other grounds,* 730 F.2d 1009 (5th Cir.1984); *Stegmaier v. Trammell,* 597 F.2d at 1032 n. 4. We take judicial notice of the fact that Chicago has been such an election jurisdiction. Indeed, defendant does not even claim that *Elrod* and *Branti* are inapplicable on this ground.

■ This court also notes that *Elrod* and *Branti* require examination of the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office. *Ness v. Marshall,* 660 F.2d 517, 522 (3d Cir.1981);

*Alfaro de Quevedo v. De Jesus Schuck,* 556 F.2d 591, 593 n. 4 (1st Cir.1977). *Mummau v. Ranck,* 531 F.Supp. 402, 405 (E.D. Pa.1982), *aff'd,* 687 F.2d 9, 10 (3d Cir.1982). Thus, if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance. In this court's reiteration of the *Branti* formulation, we emphasized the functions of the office involved, not the officeholder: "The test is whether the *position* held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981) (emphasis added), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). The unarticulated purpose behind this approach seems to be two-fold: first, to resolve the issue entirely in one proceeding, thereby relieving the courts of the burden of having to reexamine a certain position every time a new administration changes the mix of responsibilities bestowed upon the officeholder; and, second, to provide certainty to litigants. *See Ecker v. Cohalan,* 542 F.Supp. at 901.

The district court found that plaintiff's only area of decisionmaking authority, while broad within the area, related solely to the mundane decisions concerning the repair and rehabilitation of the water systems and that he had no decisionmaking authority in areas in which there could be principled disagreements about goals or their implementation. Consequently, the court found plaintiff's position protected against a patronage dismissal. After a thorough review of the record, we are. left with the firm conviction that the district court was clearly erroneous in so finding.

■ The Supreme Court in *Branti* abandoned the use of "policymaker" status as having talismanic significance in the determination of which jobs are exempt from patronage dismissals. As this court has determined, an employee's position is unprotected if, first, there is room for principled disagreement in the decisions reached by the employee and his superiors, and, second, he has meaningful direct or indirect input into the decisionmaking process. *Nekolny v. Painter,* 653 F.2d at 1170.

■ Plaintiff maintains, and the district court found, that there was no room for principled disagreement in any of the areas in which plaintiff had significant decisionmaking authority. The district court apparently accepted plaintiff's contention that, because the goal of the Water Department was to provide service to all residents without regard to politics, there could be no principled disagreements about the basic policies of the Department. *Cf. Jones v. Dodson,* 727 F.2d at 1338. This is an unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services. Indeed, one of the biggest, if not the biggest, turning points in the 1979 Chicago mayoral election involved the provision of snow-removal services. The primary function of any local governmental entity is the provision of services such as police and fire protection, public schools, hospitals, transportation, and ıibraries, as well as quasi-utility functions such as water, garbage, and sewage services. Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal. Therefore, the fact that plaintiff's position concerned the provision of water to all citizens does not mean that the Water Department had no goals about which there could be principled disagreements.

A related argument by plaintiff is that he performed merely ministerial functions. Yet, the position that he occupied, the second highest job in a large and vital city

Department, included the administration of a Bureau with 1,150 employees and an annual budget of about $40,000,000. Moreover, it is the position, not the duties performed by a particular occupant of that position, to which we must look to determine if plaintiff is exempt from the prohibition against patronage dismissals. The sheer size of the Bureau's staff and budget, particularly in light of the fact that his annual $62,000 salary was second highest in the Department, suggests that plaintiff was in a position where his political affiliation could affect the ability of a new administration to implement new policies. Furthermore, even plaintiff acknowledged that he spent thirty percent of his time planning, developing, and recommending the Bureau's budgetary requirements and ten percent of his time developing, coordinating, and controlling "the Bureau's activities to achieve its short- and long-range goals." These are not functions of a merely ministerial officeholder. Finally, that plaintiff never altered the new construction plans developed by his Bureau's Engineering Department is irrelevant because his supervisory position certainly gave him the authority to amend the plans before he forwarded them for further action.

The present case is entirely unlike *Stegmaier v. Trammell*, 597 F.2d 1027 (5th Cir.1979), in which the court held clearly erroneous a district court's finding that a Deputy Circuit Clerk, second-in-command only to the Circuit Clerk, was a policymaker. The appellate court noted that the Circuit Clerk did not set policy for the Clerk's office; rather, the Administrative Director of the state court system established policy, thus drastically limiting the discretion of both the Clerk and his deputies. *Id.* at 1034–35. *See also Barnes v. Bosley*, 745 F.2d at 508. The court contrasted the deputy clerkship with positions that demand something more than simply ministerial competence, where the employee creates or implements policy and has broad responsibilities with ill-defined objectives. *Id.* at 1035.

The present case presents a situation strikingly similar to the one hypothesized in *Stegmaier.* No outside authority limited the discretion of the Water Department in the development and implementation of plans. The evidence is uncontradicted that, even though ultimate decisionmaking authority in most areas rested with the Commissioner, plaintiff had substantial input into those decisions. Plaintiff's duties were not strictly circumscribed and, according to his own position evaluation, required something substantially more than simple ministerial competence. *See Newcomb v. Brennan*, 558 F.2d 825, 829–30 (7th Cir. 1977), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455.

Plaintiff's situation more closely approximates that of the claimant in *Shakman v. Democratic Organization of Cook County*, 722 F.2d 1307 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 279, 78 L.Ed.2d 258, in which this court held the second highest employee of the Chicago Park District to be exempt from protection. The factors enunciated by this court in support of the decision included the claimant's lofty status and the concomitant concern with considerations of political loyalty, the fact that his responsibilities were not narrowly defined, and the fact that he had meaningful input into the Park District's policies and goals. Plaintiff's position is virtually identical.

In a further effort to demonstrate that plaintiff lacked decisionmaking authority, plaintiff refers to the fact that the City Council had to approve all construction plans proposed by the Department. Yet, plaintiff acknowledges that he was the first supervisor to review plans developed by the Department's engineers. The executive branch of a municipal government is not always in agreement with the legislative branch, and the fact that policies with respect to new construction must be formulated by the Commissioner and Deputy Commissioner could have significant impact on the administration's ability to carry out its policies. Without the ability to entrust the furtherance of those policies to plaintiff, Corey could not ensure adequate support for the administration's goals.

Therefore, we hold that defendant has fulfilled its burden under *Branti* to establish that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. at 518, 100 S.Ct. at 1294. Plaintiff's position involved meaningful input into decisionmaking in areas where there could be principled disagreements. *Nekolny v. Painter,* 653 F.2d at 1170. The district court was clearly erroneous in finding to the contrary.

Lastly, plaintiff looks to the fact that his position was deleted from the city budget after his dismissal as an indication that the dismissal was politically motivated, because both sides agreed that the position was one of great importance. The assertion of critical importance is certainly consistent with our conclusion that plaintiff's position was exempt from the *Elrod-Branti* restrictions, a conclusion that relieves this court of the need to address the issue of political motivation as well as the other issues raised by the parties. We note, in passing, that plaintiff's last argument—that the elimination of an employee's position after his dismissal indicates that the dismissal was politically motivated—might unduly constrain a new administration from attempting to achieve cost efficiencies by reducing the size of its executive work force. *See Tanner v. McCall,* 625 F.2d 1183, 1194–96 (9th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). For, as we have recently stated, "the purpose of the policymaker exemption ... is to ensure that the first amendment's protection not interfere with the workings of democratic governments and the ability of duly elected officials to implement their policies." *Shakman v. Democratic Organization of Cook County,* 722 F.2d at 1310.

We acknowledge the district court's concerns with the unfortunate aspects of the dismissal of a public servant who labored long in service to the city and rose to a high rank only to discover that achieving that rank leaves him unprotected from patronage dismissals. We find it regrettable that defendant has been unable to accommodate plaintiff in another capacity, despite his express willingness to take a lower paying job. Nonetheless, these concerns do not affect our analysis of the legal issues involved.

## IV. CONCLUSION

The finding of the district court that plaintiff's position was protected against patronage dismissals is clearly erroneous. We find that the position of First Deputy Commissioner of the Chicago Water Department is exempt from protection. Accordingly, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.