Sherwin RUBENSTEIN, Petitioner,

v.

CITY OF CHICAGO, a municipal corporation, Respondent.

Michael L. SHAKMAN, et al., Plaintiffs,

v.

The DEMOCRATIC ORGANIZATION OF COOK COUNTY, et al., Defendants.

Nos. 84 C 8590, 69 C 2145.

United States District Court, N.D. Illinois, E.D.

July 18, 1985.

Gary A. Weintraub, Chicago, Ill., for petitioners and plaintiffs.

Donald Hubert, Donald Hubert & Associates, James D. Montgomery, Corp. Counsel, City of Chicago, Chicago, Ill., for respondent and defendants.

MORAN, District Judge.

### MEMORANDUM AND ORDER

This case presents the question whether the respondent City of Chicago violated the *Shakman* consent decree when firing the petitioner. The cross motions for summary judgment raise two issues: first, whether petitioner's position is exempt from the decree and, second, if not, whether petitioner's firing stemmed improperly from his political inclinations.

### FACTS

Petitioner Sherwin Rubenstein had been an employee of the City for eighteen years when he was terminated from his job on September 26, 1984. He joined the City workforce as chief virologist within the Division of Laboratories of the Department of Health. In 1976 he was promoted to Assistant Director of Laboratories. As part of a restructuring of the Department of Health in 1980 Rubenstein was placed in charge of the newly established Bureau of Health Regulations.

The Bureau of Health Regulations was divided into three sections. The Institutional Care Section was responsible for enforcing ordinances relating to long term care facilities, hospitals, day care centers,

emergency medical services attendants, proprietary medical clinics and proprietary laboratories. The Environmental Section responded to various environmental hazards such as pesticides and included a program designed to abate lead hazards in dwellings. The Complaint Section functioned as an intake mechanism for the over 7500 citizen complaints received each year by the Department of Health. Members of the complaint section handled the investigation of almost 1,000 of these complaints.[1]

In 1983 the budget for Rubenstein's bureau was $1,400,000 and he was budgeted for 66 workers. In 1984 his budget was about $1,300,000 and the Bureau was budgeted for 53 workers. Rubenstein himself was the eighth highest paid employee in the Department of Health, which has about 1700 employees. He did not hold a civil service position. Rather, he was classified as a member of the Senior Executive Service. Senior Executive Service employees serve at the discretion of the City department commissioners, do not have career service rights and may be terminated from their jobs without a hearing and without cause.

A May, 1980, description of Rubenstein's position describes it as "responsible for the management and directly relating to the enforcement of Municipal Codes as they relate to the standards established for the City of Chicago's Department of Health." The document describes Rubenstein's function as follows:

This position will coordinate the activities and efforts of immediate subordinate positions by motivating, developing and providing direction. This position will author regulatory ordinances or amendments to existing ordinances for City Council consideration. This position will plan, develop and review the effectiveness of programs that enforce Depart-

ment of Health guidelines and Municipal Codes.

This position will respond to public, media or outside agency inquiries that ask for clarification of a bureau policy or program. This position will also attend various health-related meetings and conferences.

A section entitled "Position Latitude" reads as follows:

The questions or problems which this position must address, will usually entail the incumbent's issuing of an interpretation, clarification, or recommendation on a misunderstood or problem regulatory policy, direction, or issue. Because this position also serves the technical consultant to the Department of Health and other city departments/agencies, the incumbent must exercise discretion and independent judgment when arriving at a decision. This position also has authority to hire and terminate Bureau personnel.

Rubenstein's position, however, was not without some limits.

If problems that may involve a shift or change affecting Department policy or procedures arise, they will be referred to the Deputy Commissioner. Any problems that involve disclosing of sensitive information would also be referred to the Deputy Commissioner.

The job description also states that Rubenstein will be "in constant contact" with other ranking Health Department officials concerning not just technical matters but also "information pertaining to health code enforcement." Rubenstein's position was described as one with extensive contact with the City's corporation counsel, the Department of Inspectional Services, and outside agencies and organizations.

In mid–1982 Rubenstein prepared his own description of his job. He listed eighteen position functions, which are set out in full in a footnote.[2] The description states that Rubenstein "[w]ill author regulatory

---

**1.** Rubenstein was also in charge of a code enforcement program relating to funeral establishments. Presumably because the inspectors came from another division, this function was not organized into a separate section under Rubenstein's control.

**2.** Rubenstein outlined 18 position functions which were supposed to be listed in descending order of importance:

1. Is responsible for management and direction of a Bureau directly related to the enforcement of Municipal Codes as they relate to

ordinances or amendments to existing Ordinances for City Council consideration. Will plan, develop, and review effectiveness of programs that enforce Department of Health guidelines and Municipal Codes."

Rubenstein also wrote that his job entailed responding to inquiries from the public, media and outside agencies asking for clarification of a Bureau policy or program. He described himself as responsible for both interpreting and recommending changes in problematic regulatory policies, directions and issues. Rubenstein also indicated that his job functions included preparation of the Bureau's budget, testifying before the City Council, "heavy public contact in matters dealing with complaints [and] emergencies," and authority to hire, recommend promotions and terminations of Bureau personnel. In his deposition Ru-

benstein testified that 60 per cent of his duties were managerial, 10 per cent were technical, and 30 per cent were a combination of the two areas.

The record reveals that Rubenstein actually performed a wide range of tasks. Rubenstein was asked by other public officials to review and comment on proposed ordinances and amendments. He helped draft and revise ordinances. To some extent he served as a conduit for ideas and concerns from health industry and community groups. He testified before City Council and state legislative committees and regularly attended Board of Health meetings. Rubenstein also helped conduct at least one professional symposium.

Rubenstein's bureau dealt with problems that unquestionably had political implica-

the standards established for the Department of Health.

2. Will serve as technical consultant to the Department of Health and other city departments/agencies in matters pertaining to health code enforcement.

3. Will coordinate the activities and efforts of immediate sub-ordinate positions by motivating, developing and providing direction.

4. Will author regulatory ordinances or amendments to existing Ordinances for City Council consideration. Will plan, develop, and review the effectiveness of programs that enforce Department of Health guidelines and Municipal Codes.

5. Will respond to public, media or outside agency, inquiries that ask for clarification of a Bureau policy or program; and attend various health-related meetings and conferences.

6. To provide effective leadership and develop measures for sub-ordinates and their staff to aide in adjusting to new changes and working as a cohesive unit.

7. The incumbent will interpret, clarify or recommend on a misunderstanding or problem regulatory policy, direction or issue.

8. Will serve as technical consultant to Department of Health and other city departments/agencies, etc., and exercise discretion and independent judgment when arriving at a decision.

9. Will exercise the authority to hire, recommend promotions and terminate Bureau Personnel.

10. Will be in direct contact with other departmental Administrators and Bureau Directors regarding information pertaining to health code enforcement and provide technical information and advice; will exchange legal questions and information with the City's Corporation Counsel. Responsible for consulting

with the Department of Inspectional Services in the development and establishing of inspectional procedures and assist other City, State and Federal Agencies as to health related information to be exchanged and consulted upon to include University, United States Food and Drug Administration and various other Health Service Organizations.

11. Consult with Department Administrators and Bureau Directors to establish and enforce health care regulations/policies to ensure the safety of the public at large.

12. Motivate, develop and provide direction for immediate subordinates to increase efficiency of the Bureau of Health Regulations.

13. Interpret and clarify Department of Health policies or program for Department Administrators, Bureau Directors, or immediate sub-ordinates to ensure thorough understanding and intent of the policy or program and its proper implementation.

14. Author regulatory ordinances or amendments to existing ordinances affecting Department of Health programs to ensure better health protection/care for the citizens of Chicago.

15. Responsible for budget preparation and submission and oversee purchases and expenditures for the Bureau as a whole.

16. Responsible for testifying before the City Council on Ordinances to be considered and passed by them.

17. Heavy public contact in matters dealing with complaints, emergencies, and also as a guest speaker before interested organizations and civic groups.

18. Spokesman for regulatory and technical information to the Media.

tions. For example, the institutional care section was involved with much publicized problems concerning the quality of care at nursing homes. The Bureau was also involved in the Tylenol poisoning problem. Consequently, Rubenstein in the course of his duties was interviewed on television ten to fifteen times and was mentioned or quoted in newspaper articles 20 to 25 times. He also played a behind-the-scenes role with respect to the media, writing speeches and helping draft press releases for the Commissioner.

As part of his work Rubenstein had extensive contact with management level officials both without and within the Department of Health. Because the Bureau's work often came in reaction to pressing public health problems, he had contact with other public officials involved with these problems. This appears to have been the case not only with highly publicized public health problems but also when his bureau was responding to some of the individual citizen complaints.

The focus of the record, like the litigation, is on the aspects of Rubenstein's job that may have made him a policymaker. There is no indication, however, that he did not play an active and important role in the day-to-day management of his office and in the operation of the Department of Health as a whole. His actual duties, in short, approximated the full range of those listed in the written descriptions of his job.

In early 1984 the Department of Health was reorganized by the incoming commissioner. The Bureau of Health Regulation was renamed the Division of Health Regulation.[3] In his deposition Rubenstein described the difference between a bureau and a division as "predominantly in lines of reporting." When Rubenstein headed the Bureau he reported to the deputy commissioner, who in turn reported to the commissioner. After the reorganization Rubenstein reported to a Bureau chief, who reported to the deputy commissioner, who in

turn reported to the commissioner. When asked what other differences resulted from the shift from a bureau to a division, Rubenstein replied that "[n]ot any other that were ever noticeable to me or explained to me."

**DISCUSSION**

**I.**

The history of the *Shakman* litigation was recently summarized by the Seventh Circuit in *Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.1984), and need not be recounted at length here. Essentially, the May 1972 consent decree enjoined the *Shakman* defendants from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of government employment, with respect to one who is at the time a governmental employee, upon or because of any political reason or factor." *Shakman v. Democratic Organization of Cook County,* 481 F.Supp. 1315, 1358 (N.D. Ill.1979) (reproducing decree).

In a judgment entered over a decade later, the district court held that public employers could apply to the court "for a determination that political party affiliation or activity are appropriate requirements for the effective performance of certain Governmental Employment positions" and that hiring and firing decisions for such positions should be exempt from the *Shakman* decree. *Shakman v. Democratic Organization of Cook County,* 569 F.Supp. 177, 182 (N.D.Ill.1983). In an appendix to the opinion the court listed approximately 1200 City positions exempt from application of the decree. Rubenstein's position was one of the thirty-eight exempted positions in the Department of Health. The district court retained jurisdiction, however, to consider petitions requesting that a particular position be deleted from the appendix as no longer exempt. That provision is the basis of this court's jurisdiction.

---

**3.** As part of the reorganization, however, the environmental lead office was transferred from Rubenstein's division to another department.

Even after the lead section was removed, Rubenstein supervised a budget of over $1,000,000 and a potential staff of over 40 workers.

Enforcement of the *Shakman* decree has proceeded with two Supreme Court decisions as a backdrop: *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). These decisions are important here because they discuss the type of public employment positions for which the First Amendment does not bar personnel decisions based on the political affiliation of the employee.

The *Elrod* Court allowed the patronage-based dismissal of public employees who were policymakers "to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." 427 U.S. at 367, 96 S.Ct. at 2687. *See also Shakman v. Democratic Organization of Cook County*, 722 F.2d 1307, 1310 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983) (*Petition of Lindsey* ). The Court described the policymaker as one whose "responsibilities are not well defined or are of broad scope." 427 U.S. at 368, 96 S.Ct. at 2687. An employee who "acts as an adviser or who formulates plans for the implementation of broad goals" is characteristic of a policymaker. *Id.*

In *Branti*, the Court shifted to a more functional approach. *See Tomczak*, 765 F.2d at 640. A public employment decision can be based on political affiliation if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the office involved." 445 U.S. at 518, 100 S.Ct. at 1295. Political loyalty must be "essential to the discharge of the employee's governmental responsibilities" in order for the employee's dismissal to survive First Amendment scrutiny. *Id.*

In *Tomczak*, the Seventh Circuit outlined the test for exempt status under the *Shakman* decree:

> [A]n employee's position is unprotected if, first, there is room for principled disagreement in the decisions reached by the employee and his supervisors, and,

second, he has meaningful direct or indirect input into the decisionmaking process.

765 F.2d at 641. The *Tomczak* Court reversed a lower court's decision that the first deputy commissioner of the Department of Water was not exempt from the *Shakman* decree.

*Tomczak* illustrates the fact-specific approach that district courts must follow in weighing *Shakman* contempt petitions. However, the decision sets out several helpful guidelines. First, the district court must examine the powers inherent in a public employment position and not simply the functions performed by the present officeholder. At 640. *See also Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). Second, the *Tomczak* Court noted that offices devoted to the provision of services to all citizens may still require decisions that are political in nature:

> The primary function of any local governmental entity is a provision of services such as police and fire protection, public schools, hospitals, transportation, and libraries, as well as quasi-utility functions such as water, garbage and sewage services. Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal.

At 641. Finally, the Court looked to specific characteristics of a job position, including (1) the size of the petitioner's office staff; (2) petitioner's salary; (3) the percentage of time petitioner devoted to planning functions; (4) the breadth of petitioner's responsibilities; and (5) the extent of petitioner's input into the Department's policies and goals. *Id.* at 641–642.

## II.

The court is well aware of the important constitutional considerations that underlie

the *Shakman* decree. It seeks to avoid blazing a precedential trail that will permit the *Shakman* exemptions to unduly constrict the scope of the consent decree. This case is somewhat difficult because Rubenstein's position is not as high as the first deputy commissioner of the Department of Water, *Tomczak, supra,* or the superintendent of employment of the Chicago Park District. *Petition of Lindsey, supra.* Nevertheless, because Rubenstein's position was devoted to matters of great political sensitivity, and because his position had a substantial role in the decisionmaking process, it is properly exempted from the *Shakman* decree.

Two important facts characterize Rubenstein's position (and the operation of the division he headed). First, it covered areas of high public visibility and concern. The efforts of the Institutional Care Section, for example, directly affected the conditions faced by thousands of Chicagoans in hospitals, nursing homes and other institutional care facilities. Second, much of Rubenstein's work was reactive, coming in response to various public health crises, like the incidents of Tylenol poisoning and the rash of nursing home deaths. Thus, an important part of Rubenstein's work was performed in the crucible of focused public attention and concern.

The nature of Rubenstein's position thus made political loyalty even more essential than in *Tomczak, supra, Lindsey, supra,* and *Vrdolyak v. City of Chicago,* 604 F.Supp. 1325 (N.D.Ill.1984) (appeal pending). In each of those cases the work that the petitioner performed or supervised was important but routine. They typically did not engage in highly publicized crisis management of the sort Rubenstein was asked to perform.

Moreover, Rubenstein's position sometimes thrust him into the media spotlight. In an age where it is said that television has replaced the precinct captain, even occasional media appearances can play a significant role in shaping voter perceptions of the quality of a mayoral administration.

Rubenstein's position encompassed a broad range of duties. His work was both managerial and technical in nature, with the heavy emphasis on managerial duties. While Rubenstein's duties were specified, they were not tightly circumscribed by written guidelines or regulations. His was an open-ended position and the open-endedness of the position was heightened by the reactive nature of the job to public health exigencies.

The open-endedness of Rubenstein's position and the relatively high public visibility of the important work of his division meant that there was much room for principled disagreement in the decisions he made and in the decisionmaking process in which he participated. Formulating proper responses to public health emergencies as well as determining the proper level and focus of enforcement efforts are politically sensitive decisions. Such public health decisions are a reflection of the political philosophy of a mayoral administration and an important test of administrative competence in the eyes of the public. Loyalty and political compatability with the incumbent administration are not unimportant qualifications in these circumstances.

The record shows that Rubenstein played a substantial role in decisionmaking on public health issues. He conveyed information from various health care groups to City decisionmakers. His participation in the decisionmaking process was not limited to supplying specific technical information. For example, as a result of his concerns about the operation of the Health Department, Rubenstein and another Health Department official met with the Mayor's top political adviser to discuss the work of the Commissioner and his two deputies. Rubenstein also drafted ordinances and gave his opinions about ordinances sent to him for review. This suggests that his opinions were actively solicited and, presumably, relied upon.

At least before the Department was reorganized, Rubenstein was part of the inner circle of decisionmakers in the Department of Health. It is unclear if Rubenstein's

exclusion from the inner circle after the reorganization was a function of strained relations with higher officials or attendant with the renaming of his office as a division. Nevertheless, the reorganization did not affect many of the substantive functions of Rubenstein's office. It is thus apparent that even after the reorganization Rubenstein's position was situated as as to play an important decision making role, especially during public health crises. Moreover, the technical information developed in the Division of Health Regulations, and its many enforcement functions, ensured that the occupant of Rubenstein's office will play a major decisionmaking role about even less pressing problems.[4]

Rubenstein's position also is accompanied by the indicia of an exempt position. His salary put him in the top one-half of one per cent of the Health Department workforce. He supervised a substantial staff of at least 40 employees, divided among three sections. His job was not covered by civil service restrictions. *Cf. Lindsey,* 722 F.2d at 1308. He devoted the majority of his time to managerial activities.

Petitioner relies heavily upon *Vrdolyak v. City of Chicago,* 604 F.Supp. 1325 (N.D. Ill.1984) (appeal pending), but that case is distinguishable. First, Rubenstein was directly responsible for an office containing three sections. Vrdolyak's job, in contrast, was primarily as an assistant to a bureau director, and only as part of his job did he direct a single section. As an assistant, Vrdolyak's position was less likely to play a

major decisionmaking role. Second, Rubenstein's position was more oriented towards crisis management than Vrdolyak's. There is no indication, for example, that Vrdolyak's work ever thrust him into the media spotlight. Third, unlike Rubenstein, there is no indication that Vrdolyak played an active role in the drafting and amending of City ordinances. Because of these substantive differences, the fact that Rubenstein's and Vrdolyak's lines of bureaucratic communication to the department commissioner were of roughly equal length is not decisive. The proper focus is on the actual responsibilities attendant with a position and not its location in the organizational flow chart.

Petitioner also suggests that the policymaking functions of the Health Department were limited because the Board of Health was responsible for setting Department policy. The Board is appointed and meets monthly. City agencies, however, are all subject to oversight by, at a minimum, the Mayor and the City Council. The existence of oversight does not mean that the top members of City agencies do not have significant policymaking roles. *See Tomczak,* 765 F.2d at 642–43. Moreover, in *Lindsey* the petitioner's agency was governed by an appointed commission. This fact did not prevent the court from determining that a high ranking position in the agency was exempt.[5]

For all these reasons, Rubenstein's position is properly exempt from the *Shakman*

---

**4.** The *Tomczak* Court stressed that a petitioner need not have final decisionmaking power in order to be exempt. It recognized the important role played by public employees who are relied upon for policy recommendations and implementation efforts:

In a further effort to demonstrate that plaintiff lacked decisionmaking authority plaintiff refers to the fact the City Council had to approve all construction plans proposed by the Department. Yet, plaintiff acknowledges that he was the first supervisor to review plans developed by the Department's engineers. The executive branch of the municipal government is not always in agreement with the legislative branch, and the fact that policies with respect to new construction must be formulated by the Commissioner and Deputy

Commissioner could have a significant impact on the administration's ability to carry out its policies. Without the ability to entrust the furtherance of these policies to plaintiff, [plaintiff's supervisor] could not ensure adequate support for the administration's goal. At 642.

**5.** Respondent advises that the City Council has refused to approve or even consider the current mayor's appointments to the Board of Health. While this delay may be an acceptable tactical ploy during political in-fighting, it illustrates that each administration needs to have discretion in hiring top echelon public officials. Otherwise, an administration would have no opportunity to reshape city operations.

decree. Consequently, whether Rubenstein's firing was prompted by his political affiliation is a moot question.[6] The circumstances of Rubenstein's forced departure from City government are not especially appealing. Nevertheless, in the rough-and-tumble world of politics, high ranking public officials must be subject to replacement by each City administration. Elected officials have a right to assemble a cadre of dedicated, trustworthy and loyal administrators who can be relied upon to implement policy changes.

## CONCLUSION

Respondent's motion for summary judgment is granted. Petitioner's motion for partial summary judgment is denied.

**6.** Thus, the court need not consider petitioner's     motion to strike portions of various affidavits.