**Sharon MURTAUGH, Plaintiff,**

v.

**The CITY OF CHICAGO, et al., Defendants.**

**No. 83 C 8053.**

United States District Court, N.D. Illinois, E.D.

April 10, 1987.

Stuart Galesburg, Gerald B. Saltzberg, Fishman & Fishman & Saltzberg, Chicago, Ill., for plaintiff.

Bradford P. Lyerla, Jerold S. Solovy, Jeffrey D. Colman, Jenner & Block, Chicago, Ill., for defendants.

Joseph M. Gagliardo, Office of the Corp. Counsel, Chicago, Ill., for City of Chicago.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

The plaintiff, Sharon Murtaugh, instituted this action against the City of Chicago ("the City"), alleging that the City terminated her employment in violation of the *Shakman* decree. This decree prohibits the firing of City employees based on their political affiliation. *See generally Shakman v. Democratic Organization of Cook County*, 569 F.Supp. 177 (N.D.Ill.1983).[1] The parties are before the court on the City's motion for summary judgment. For the reasons set forth below, the court finds that there is no genuine issue of material fact with respect to Murtaugh's wrongful termination claim and that defendants are entitled to judgment as a matter of law. Accordingly, the court grants the City's motion for summary judgment.

### Facts

Sharon Murtaugh's employment with the City of Chicago began in 1961. Between 1961 and 1980, she held various administrative and secretarial positions within the Daley, Bilandic and Byrne administrations, and ultimately achieved Career Service Status. In 1980, at the urging of Thomas Geary, the new Chief of Staff of Mayor Byrne's Patronage Office, Murtaugh left her Career Service position with the Chicago Fire Department to become Geary's secretary and an administrative assistant to Mayor Byrne. Her duties included coordinating activities of the Mayor's office, managing daily operations, coordinating fund raisers and collecting political contributions for Mayor Byrne. Her annual salary in the patronage office was $42,672.

In February of 1983 Harold Washington defeated Jane Byrne in the Democratic primary. Washington indicated his intent to eliminate the patronage office, and Geary realized that Murtaugh's employment with the City could be in jeopardy after Washington took office. Accordingly, Geary and Jim Richmond, one of his subordinates, sought to transfer Murtaugh to another position within City government "so that her employment with the City of Chicago would be protected from any political ramifications from the new administration, pursuant to Geary's promise to protect her employment from the new administration." (Pl.Mem. at 3). Richmond testified that he considered three factors when determining the appropriate transfer position for Murtaugh: comparable salary, length of employment and experience with the City, and finding a "safe" position in which Murtaugh would be protected from the political repercussions of the new administration.

Geary's search for a "safe" and "protected" position led him to the Department of Aviation ("DOA"), which was run by Commissioner Thomas Kapsalis, also a Byrne appointee. Richmond contacted Kapsalis and informed him of Geary's desire to transfer Murtaugh to the position of Director of Aviation Development, at her current salary of $42,672. Kapsalis vehemently objected to the transfer, and informed Richmond that he would not approve it. He characterized Murtaugh as a "$42,000 secretary," and told Richmond in no uncertain terms that he wanted an architect or engineer to fill that position.

Kapsalis' assessment of Murtaugh's qualifications was based on his personal knowledge of her previous positions within city government. He instructed his first deputy commissioner, Joe Cusummanno, not to approve Murtaugh's transfer. Despite these instructions, Cusummanno signed the CS-14 transfer form in February of 1983, while Kapsalis was out of town. According to Cusummanno, he was told by the Mayor's Office to process the requisition and transfer. Kapsalis voiced his disapproval of the transfer immediately upon his return, but did not take any action to rescind it.

1. For a comprehensive background of the *Shakman* litigation, see Note, *Consideration of Administrative Loyalty in Identifying Positions Exempt from the Shakman Decree,* 17 Loy.U.Chi L.J. 119, 122–129 (1985). *See also Tomczak v. City of Chicago*, 765 F.2d 633, 635–36 (7th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985).

Murtaugh was never interviewed for the position of Director of Aviation Development, and the DOA never received a copy of her resume prior to the transfer. Although the DOA had a job description for this position, this description was never relayed to Murtaugh. At the time of her transfer, this job description provided:

Under the direction of the Deputy Commissioner of Aviation for Planning and Development, the Director of Aviation Development

* Implements plans for continued growth of Chicago aviation facilities;
* Insures that facility designs and specifications meet federal, state and local engineering standards;
* Insures that all activities relating to construction projects are scheduled in the proper sequence;
* Coordinates with the City's Purchasing Department and Department of Public Works to obtain necessary contractors to perform airport development projects;
* Coordinates supervision of all airport construction work with other city departments and agencies;
* Insures that all development projects are completed in accordance with budget limitations;
* Administers development grants.

(Ex. C to Def. Mo. for Summary Judgment).

Murtaugh was placed on the DOA payroll on March 10, 1983. Although paid out of the DOA budget, she continued to work in Mayor Byrne's patronage office until the inauguration of Harold Washington in May of 1983. She reported to work at the DOA on May 10, 1983. Kapsalis continued to oppose the transfer, and viewed this two month period as an absence without leave from the DOA.

Murtaugh received the same salary at the DOA that she had received at the Mayor's patronage office. At $42,672, she was the second highest paid employee in the planning section of the DOA. Only John Drummond, the deputy commissioner and a registered architect, earned a salary greater than Murtaugh. Her salary exceeded that of her supervisor, Joe Anselmo, who was the Director of Planning and a registered architect and city planner.

Between May and August of 1983, Murtaugh was given various tasks to perform for individuals in the DOA. She performed satisfactory work for Donald Pries, the Program Manager of O'Hare Development Program. Joseph Anselmo, her direct supervisor at the DOA, gave her a project on cost revenue centers and an ongoing project of tracking professional milestones in a large construction project of the O'Hare Expansion Program. He was disappointed with her performance on these projects because she did not appear to have a "good grasp" of the assignments, and she took an inordinate amount of time to complete them. Anselmo also objected to Murtaugh's frequent use of the telephone for personal business. He discussed her personal calls with his supervisor, John Drummond, and subsequently advised Murtaugh to cut back on her personal telephone time.

Beginning in January or February of 1983, prior to Murtaugh's transfer, the DOA began a reevaluation of its organization and structure. Kapsalis appointed an "ad hoc" committee to work with the DOA's outside consultants, Landrum & Brown, to study the existing management structure and to devise a reorganization of the Department to clarify specific job functions with respect to the massive O'Hare redevelopment program. In response to Landrum & Brown's observation that the DOA had become "top heavy," the committee focused particular attention on the upper level employees to determine if their salaries were commensurate with the jobs actually performed. In the course of this evaluation, the committee determined that Murtaugh's performance at the DOA did not justify her salary. Deputy Commissioner Ivan Harlan explained, "We couldn't find technical or performance qualifications to support her retention in any of the available titles at a salary level that was commensurate with what she was making." (Harlan Dep. at 47). Accordingly, the committee issued a recommendation to termi-

nate Murtaugh. It did not recommend her transfer to another position within the DOA because her existing salary greatly exceeded the salary provided for other openings. Murtaugh was not the only employee that the committee recommended for termination in the course of its reevaluation of the DOA.

Kapsalis, who had objected to Murtaugh's qualifications from the time the transfer was suggested, accepted the ad hoc committee's recommendation and fired Sharon Murtaugh on August 18, 1983. It was solely his decision to terminate her. Kapsalis acknowledged that he could have fired her immediately; however, he stated that he wanted to wait until he received the report and recommendation from the committee before he took any official action.

According to Kapsalis, his opposition to Murtaugh's transfer was based only on her lack of qualifications, not her affiliation with the former mayor. James Richmond, one of Murtaugh's co-workers in the patronage office, confirmed Kapsalis' objection based on qualifications; yet, he also expressed his "belief" that Kapsalis may have considered Murtaugh a "political liability." This "belief" was mere speculation; however, because Richmond could not cite any instances where, by words or conduct, Kapsalis displayed a political motivation for rejecting Murtaugh as a Director of Aviation Development. Kapsalis had told Richmond directly that Murtaugh was a "$42,000 secretary," with no qualifications for the job, and that he wanted to fill that position with an engineer or an architect. In addition, Richmond admitted that Kapsalis' reaction to Murtaugh's transfer was the same reaction that he had given to other proposed transfers with inadequate qualifications.

### Summary Judgment

On a motion for summary judgment, the moving party has the burden of establishing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Cedillo v. International Ass'n of Bridge & Structural Iron Workers*, 603 F.2d 7, 10 (7th Cir.1979). The non-moving party is entitled to all rea-

sonable inferences that can be made in its favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the defendant may not merely rely on conclusory pleadings to withstand summary judgment. In responding to a motion for summary judgment, he must set forth specific facts in affidavits or otherwise show that there are genuine issues that must be decided at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

The purpose of the summary judgment procedure is to eliminate trial in cases where a trial is unnecessary and only results in delay and expense. *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972). As the Seventh Circuit has noted, with the ever-increasing burden on the judiciary, persuasive reasons exist for the utilization of summary judgment procedures whenever possible. *Kirk v. Home Indemnity Co.*, 431 F.2d 554, 559–60 (7th Cir. 1970). Courts therefore will not strain to find the existence of a genuine issue where none exists. *Id.*

■ In order to defeat the City's motion for summary judgment, Murtaugh must present competent evidence to show that her political affiliation with Mayor Byrne was a "motivating factor" in Kapsalis' decision to fire her. Once Murtaugh satisfies that burden, then the City must demonstrate that the termination would have occurred regardless of Murtaugh's allegiance to Mayor Byrne. *Nekolny v. Painter*, 653 F.2d 1164, 1167 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), citing *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Gannon v. Daley*, 561 F.Supp. 1377, 1379 n. 1 (N.D.Ill.1983). The *Nekolny* court explained:

> The *Mount Healthy* test allows a defendant to terminate an employee for any legitimate reason, even where, as in *Mount Healthy* itself, a reason violative

of the First Amendment was also a substantial or motivating factor in the decision. It should also be noted that the plaintiff has the initial burden of proving by a preponderance of the evidence that the protected conduct was a 'substantial' or 'motivating' factor. That burden is not insignificant. A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election. *Nekolny*, 653 F.2d at 1168.

▮] After reviewing all the depositions, affidavits and exhibits presented on this motion for summary judgment, the court doubts whether Murtaugh could state a prima facie case for wrongful termination in violation of the *Shakman* decree. Her "evidence" of Kapsalis' political motivation consists primarily of the unsupported speculation of Jim Richmond, one of her co-workers in the patronage office. Richmond was unable to cite any words or actions on the part of Kapsalis to support his "belief" that Kapsalis considered her a political liability. However, even if Murtaugh could establish that her affiliation with Jane Byrne was a motivating factor in her discharge, the City would still be entitled to summary judgment for two reasons. First, the City has presented uncontradicted evidence that Murtaugh was unqualified for her position, and she was discharged because she lacked the proper qualifications.[2] Second, the Director of Aviation Development is properly classified as an exempt position under Schedule G of the *Shakman* decree.

**2.** Murtaugh cites the fact that Kapsalis allegedly disliked Mayor Byrne as proof that her alignment with Byrne precipitated her discharge. However, the fact that Kapsalis disliked Byrne is insufficient to establish that he would fire any Byrne appointee, no matter how qualified. *Nekolny, supra.* Murtaugh was not the only DOA transfer from the patronage office. She has not provided the court with any factual materials that Kapsalis treated *qualified* transfers from the patronage office any differently from other qualified employees. In fact, Kapsalis specifically stated that he would have considered Murtaugh if she had applied for an administrative or secretarial position, for which she was admit-

### Qualifications For The Position

Murtaugh has not presented the court with any factual materials demonstrating her qualifications for the position. The fact that she spent over twenty years in city government may be commendable, but it does not establish her right to the job in question. At the time of her transfer, the DOA had a job description for this position. The ad hoc committee revised this job description during the course of its meetings (Ex. B to Def. Mot. for Summary Judgment). Her background of secretarial and administrative positions fails to satisfy the basic prerequisites of either description.

Murtaugh contends that her qualifications cannot be judged by these job descriptions, because she was never provided a copy of the first description, and the second description was promulgated after she commenced work at the DOA. She alleges that she requested a job description, but was told that none was available. Neither of the personnel employees deposed by plaintiff recalled this alleged request. The fact that she never received a job description does not prevent the City from requiring her to live up to the qualifications of the job, however. Before her transfer, she knew that Commissioner Kapsalis wanted to fill the position with someone with an architectural or engineering background. Even without the job description, she knew that she did not possess the technical qualifications that the Commissioner sought for this position, and that Kapsalis based his objections on the fact that the position required a technical background that she did not possess.[3] Richmond unsuccessfully tried to convince Kapsalis that the position

tedly well qualified. Murtaugh apparently did not apply for such a position because the salary at the DOA was well below the $42,000 annual salary she received in the patronage office.

**3.** Although the revised job description is lengthier and more detailed than the one in existence at the time of Murtaugh's transfer, its basic prerequisites are the same (see Ex. B, Ex. C to Def. Mo. for Summary Judgment). It serves as a clarification and expansion of the earlier description. The court need not determine whether this description applies retroactively to Murtaugh's transfer, however, because her background was clearly insufficient to match the

could be performed by an individual with an administrative background, but Kapsalis remained firm in his desire to hire an architect or engineer for the position.[4] Under the circumstances of this case, the lack of a job description did not prevent her from learning the basic nature of the position or its prerequisites. She took her chances when she accepted the transfer knowing that she did not possess the talents that Commissioner Kapsalis sought for that position.[5] There is nothing improper connected with the Commissioner's or committee's comparison of her performance and qualifications against the job description provided for the position.

This transfer placed Murtaugh in a $42,000 job for which she was clearly unqualified. Within her department, she earned more money than her supervisor, Joe Anselmo, and was second only to John Drummond, the Deputy Commissioner of Aviation. Despite her high salary, her performance at the DOA was primarily clerical or administrative in nature, because she did not appear to have a "good grasp" of the Department's operations. Under these circumstances, it is not surprising that the ad hoc committee targeted her as an employee whose salary failed to match her skills.

**Exemptions Under The Shakman Act**

■ In addition, the court finds that, even if somehow Murtaugh could establish

some evidence of political animus on the part of the Commissioner, she still cannot avoid summary judgment because her position is exempt from the prohibitions of the *Shakman* decree. The *Shakman* decree prohibits the discharge of public employees based on political considerations. *Shakman v. Democratic Organization of Cook County*, 481 F.Supp. 1315, 1358 (N.D.Ill. 1979). However, the decree's prohibitions are inapplicable to positions which, by their nature, involve "policymaking to such a degree or are so confidential in nature" that political allegiance is a legitimate hiring criterion. *Id.* In 1983, the *Shakman* court issued an implementation order regarding the consent decree, which included an appendix containing a list of approximately 1200 "exempt" positions ("Schedule G"). *Shakman*, 569 F.Supp. 177, 191–203 (N.D.Ill.1983). The court retained jurisdiction to consider employees' suits to delete their positions from Schedule G of the appendix. *Shakman*, 569 F.Supp. at 207.

■ Sharon Murtaugh's position as Director of Aviation Development is one of the thirty-one DOA positions listed as exempt from the provisions of the *Shakman* decree. She argues that the classification of the position cannot be applied to her because she never held a confidential posi-

---

basic skills outlined in the description in effect at the time of the transfer.

**4.** Murtaugh alleges that since two people who held the title prior to her did not possess adequate qualifications, the City could not require her to be qualified, either. These two employees, Mike Healy and Romie Lopat, carried this title during a transitional period while awaiting transfer to another division. Neither was hired for the position of Director of Aviation Development. They were both hired for different positions and temporarily given the title for budgetary reasons. Richmond acknowledged that their duties were not representative of the duties expected from the plaintiff, and that they were not considered "role models" for the position. Unlike Healy and Lopat, however, Murtaugh's transfer to the Director of Aviation Development position was considered permanent. She was not assigned to this position until another position opened up. In addition, she can hardly compare herself to these two individuals, since they both received salaries significantly lower

than the $42,000 that Murtaugh was supposed to receive.

**5.** Murtaugh also points to the fact that Kapsalis felt she had been "foisted" on him as evidence of his political animus toward her. Kapsalis' opinion that he had been forced to accept the transfer and forego the opportunity to hire a highly qualified candidate is borne out by the manner in which the patronage office achieved her transfer. It ignored Kapsalis' objections and instructed Cusummanno to sign the transfer form. Cherryl Thomas, the personnel director at the DOA, testified at her deposition that the mayor's office told her to process this transfer without an interview or submission of a resume. According to Thomas, this "blind transfer" procedure was very unorthodox, and, to her knowledge, Murtaugh was the only employee accorded this special treatment. Given the manner in which Murtaugh achieved her transfer, it is little wonder that Kapsalis expressed his feeling that she had been "foisted" on him.

tion or exercised any policymaking judgment, and because she was transferred before the *Shakman* court incorporated Schedule G into its judgment. Both of these arguments are insufficient to defeat summary judgment on the exemption issue.

In *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985), the Seventh Circuit emphasized that the classification of exempt positions "require[s] examination of the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." The court held:

> [I]f an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance. In [*Nekolny*] ... we emphasized the functions of the office involved, not the officeholder: 'The test is whether the *position* held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.'

*Tomczak*, 765 F.2d at 641, citing *Nekolny*, 653 F.2d at 1170. Following these guidelines, the *Tomczak* court reversed the district court's determination that plaintiff's position as First Deputy Commissioner of the Department of Water was not exempt from the decree. The court noted that the "sheer size" of the department and budget, and the fact that the plaintiff's salary was the second highest in the department demonstrated that he "was in a position where political affiliation could affect the ability of a new administration to implement new policies." *Tomczak*, 765 F.2d at 642. In concluding the position was properly classified as exempt, the court emphasized the supervisory nature of Tomczak's position, which involved planning, developing and recommending budgetary decisions and

planning, developing and coordinating the bureau's activities to achieve its goals. *Id.*

Following *Tomczak*, the fact that Murtaugh never had the opportunity to receive confidential information or implement policy does not prevent the court from recognizing her position as exempt from the *Shakman* decree. "It is the position, not the duties performed by a particular occupant of that position, to which we must look to determine if plaintiff is exempt from the prohibition against patronage dismissals." *Tomczak*, 765 F.2d at 642. Murtaugh's lack of qualifications for the position explain why her tasks did not include governmental decisionmaking. Had she been qualified, she would have been in a position to affect the new administration's policies regarding the O'Hare Redevelopment Program, a massive redevelopment of one of the largest airports in the world. The job description which existed at the time of her transfer lists the significant responsibilities of this position. The Director of Aviation Development is responsible for implementing growth plans for Chicago's three airport facilities, and insuring that airport construction meets all engineering standards and budget limitations. She must be able to coordinate activities with the City's Purchasing Department and Department of Public Works, and is responsible for administering development grants. These responsibilities demonstrate that a qualified Director of Aviation Development plays a significant role in the implementation of the mayor's policies regarding airport development. The Director's ability to effectively interact with other City departments is critical to the performance of this position. Accordingly, the court finds that the Director's position falls within the class of positions which are exempt from the *Shakman* decree. *See Tomczak*, 765 F.2d at 641–42. *See also Rubenstein v. City of Chicago*, 614 F.Supp. 1412, 1416–17 (N.D.Ill.1985) (finding position of Director of Bureau of Health Regulations exempt from *Shakman* decree).[6]

The fact that Murtaugh was transferred before the appendix was promulgated does

---

6. In *Rodez v. Village of Maywood*, 641 F.Supp. 331, 336 (N.D.Ill.1986), this court listed the fol-

lowing factors as important considerations to determine whether continued employment in a

not prevent the court from classifying her position as exempt from the *Shakman* decree. This court's determination in this case that the position is exempt from the decree is not based solely on Schedule G; it is based on an analysis of the duties and responsibilities assigned to that position. Both the Supreme Court and the Seventh Circuit had promulgated specific standards to determine exemptions from the prohibition against patronage firings prior to adoption of the appendix. *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Shakman v. Democratic Organization of Cook County (Lindsey),* 722 F.2d 1307, 1309 (7th Cir.1983); *Nekolny, supra.* The *Tomczak* court used these standards to determine whether a particular position should be listed on Schedule G, and this court employed the same analysis to reach its conclusion that Murtaugh's position is exempt from the decree, and is properly included in Schedule G.[7] The fact that this list was promulgated after her transfer has no bearing upon whether the position can be classified as exempt. Under *Tomczak,* the significant responsibilities of the Director of Aviation Development place this position squarely within the class of positions exempt from the *Shakman* decree.

### Conclusion

For the reasons set forth above, the court finds that there is no genuine issue of material fact with respect to Murtaugh's *Shakman* claim and that the City is entitled to judgment as a matter of law. Accordingly, the court grants the City's motion for summary judgment.

---

particular position could be conditioned upon allegiance to a particular political party:

> (1) the nature and number of responsibilities of the office;
> (2) whether responsibilities are not well defined or are of broad scope;
> (3) whether the responsibilities include acting as an advisor or formulating or implementing policy and goals;
> (4) whether the position includes control of a budget and employees, and if so, how much and how many, respectively;
> (5) whether the position calls for close work with high governmental officials, making personal loyalty an appropriate consideration; and
> (6) the salary level of the position, as compared to other positions within the governmental entity.

These factors were distilled from the Supreme Court's decision in *Elrod* and the Seventh Circuit decisions in *Tomczak* and *Nekolny.* Murtaugh's high ranking and highly paid position at the DOA meets all six of these factors. If the position had been filled with a qualified applicant, it would have included significant open-ended responsibilities. The duties inherent in the position include implementing the City's goals for the development of airport facilities, and involve significant budgetary determinations. The position also requires interaction with other prominent government offices and carried one of the highest salaries in the department.

7. Murtaugh misconstrues the role of Schedule G in the *Shakman* litigation. Schedule G is not conclusive on the issue of whether the City can discharge an employee in a certain position. When the court included Schedule G in its implementation order, it expressly retained jurisdiction to consider petitions to delete particular positions from the Schedule. *Shakman,* 569 F.Supp. at 207. *See also Shakman,* 607 F.Supp. 1086, 1088 (N.D.Ill.1985). When considering these petitions, the courts use the same standards to determine exempt positions that they used prior to the adoption of Schedule G. *See Tomczak, supra.* Thus, the timing of the adoption of Schedule G is immaterial to Murtaugh's *Shakman* claim, because the standards promulgated prior to the Schedule clearly demonstrate that the position of Director of Aviation Development should be classified as exempt.